[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-11694

_____

D.C. Docket No. 2:16-cv-00007-WS-M

EDWARD SHAW,
as Personal Representative of the estate of Ananias Shaw,

Plaintiff-Appellant,

versus

CITY OF SELMA,
an Alabama Municipal Corporation,
CHIEF WILLIAM RILEY,
in his official and individual capacity,
OFFICER DESMOND WILLIAMS,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

(March 7, 2018)

Before ED CARNES, Chief Judge, BLACK, Circuit Judge, and MAY,[*] District
Judge.

ED CARNES, Chief Judge:

A Selma Police officer shot and killed Ananias Shaw, who was coming
toward him with a hatchet.  Shaw's estate brought 42 U.S.C. § 1983 claims for
excessive force and false arrest and state law tort claims against Officer Desmond
Williams, former Selma Police Chief William Riley, and the City of Selma.  The
district court granted summary judgment in favor of the defendants and the estate
has appealed.

## I.

## A.

In the middle of the afternoon in early December 2013, Selma Police
received an emergency call about a disturbance at a Church's Chicken restaurant.
Shaw, a 74-year-old mentally ill man, had attempted to enter the restaurant but was
turned away by its general manager.  Officers Daniel Boone, Ronald Jones, and
Desmond Williams responded to a dispatch about the incident.

The dispatch directed the officers to the Church's Chicken with the call
"disorderly conduct in progress."  The dispatcher relayed the suspect's description
to the officers and informed them that Shaw had been at the restaurant the Sunday

---

[*] Honorable Leigh Martin May, United States District Judge for the Northern District of
Georgia, sitting by designation.

before "armed with a knife."

Jones was already in the area near the Church's Chicken. After he spotted Shaw, who matched the dispatched description of the disorderly suspect, Jones radioed for the other officers to join him. The three of them found Shaw inside an abandoned laundromat down the street. Most of the events of the next two minutes were recorded by Williams' body camera.[1]

Boone, who was familiar with Shaw, went inside the building "to talk" with him and coax him out. Williams walked up to the building at roughly the same time. As he approached, Jones (who also knew Shaw) warned Williams that Shaw would "fight you in a minute."

Once inside, Boone asked Shaw to go outside the laundromat and speak with him, but Shaw refused. Shaw then bent down and picked up a hatchet. Boone drew his gun in response and started backing out of the building. Shaw, holding the hatchet, followed him.

As Boone exited the laundromat, the officers firmly and clearly told Shaw

---

[1] Because this is an appeal from summary judgment, we review the evidence in the light most favorable to the estate as the non-moving party, and draw all justifiable inferences in its favor. Tolan v. Cotton, 572 U.S. ___, 134 S. Ct. 1861, 1863 (2014). We will, however, accept facts clearly depicted in a video recording even if there would otherwise be a genuine issue about the existence of those facts. See Scott v. Harris, 550 U.S. 372, 380–81, 127 S. Ct. 1769, 1776 (2007). But where the recording does not clearly depict an event or action, and there is evidence going both ways on it, we take the estate's version of what happened.

several times to "put the axe down."[2]  Once Shaw was outside, Williams drew his gun, and Jones pulled out his baton.  Shaw began slowly walking away from the building in the direction of the restaurant.  The officers followed him down the street with their weapons drawn.  Between Shaw's curses at them, they repeatedly instructed him to put down the hatchet.  Shaw ignored them and continued walking away, hatchet still in hand.

The four continued making their way down the street, walking past some houses.  Shaw slowed down and moved onto the front lawn of one of those houses, stopping beside a parked car.  Williams, following closely, raised his pistol and ordered Shaw to put down the hatchet twice more.  Shaw stopped walking, turned, and began moving slowly towards Williams.  As he approached, Shaw shouted for Williams to "Shoot it! Shoot it!"  As he did so, Shaw's right arm and the hatchet were outside the frame of the video.

By the time he was less than five feet away from Williams, Shaw, while holding the hatchet, yelled "Shoot it!" one more time.  Williams immediately fired a single shot at Shaw's chest, and Shaw fell.[3]  The video shows that when the shot was fired Shaw was close to Williams and moving closer.  A short time afterwards, the paramedics pronounced Shaw dead at the scene.

---

[2] The officers call it an "axe" in the video, but both sides refer to it in their briefs as a hatchet, and so will we.

[3] Whether Shaw was raising the hatchet when he was shot is not clear from the video. We will assume that he did not raise it.  See Tolan, 134 S. Ct. at 1863.

In the two minutes or so between Williams' arrival at the laundromat and the shooting, the officers told Shaw to "put the axe down" at least 26 times.

## B.

After the shooting, Shaw's estate, represented by his brother, Edward Shaw, brought a wrongful death action against Williams, former Selma Police Chief William Riley, and the City of Selma. The original complaint asserted twenty-two causes of action against the defendants for various civil rights violations under the Fourth Amendment and several state law tort claims, some of which overlapped with the federal claims.

The defendants moved for summary judgment, contending that they were entitled to qualified immunity and state agent immunity, and that the estate could not prevail on any of its federal or state law claims. The district court granted the defendants' motion. It dismissed all of the estate's federal claims on the merits or on qualified immunity grounds. It also dismissed some of the estate's state law claims on the merits and the remainder of them on state agent immunity grounds.

## II.

We review de novo the district court's grant of summary judgment. Smith v. LePage, 834 F.3d 1285, 1291 (11th Cir. 2016). "Summary judgment is appropriate only if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Hamilton v. Southland

5

Christian Sch., Inc., 680 F.3d 1316, 1318 (11th Cir. 2012) (quotation marks omitted).  If that standard is met, the burden shifts to the nonmoving party to "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (quotation marks omitted).

To prevent summary judgment, a factual dispute must be both material and genuine.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S. Ct. 2505, 2510 (1986).  A fact is "material" if it has the potential of "affect[ing] the outcome" of the case.  Furcron v. Mail Ctrs. Plus, LLC, 843 F.3d 1295, 1303 (11th Cir. 2016) (quotation marks omitted).  And to raise a "genuine" dispute, the nonmoving party must point to enough evidence that "a reasonable jury could return a verdict for [him]."  Id.

When considering the record on summary judgment "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  Tolan, 134 S. Ct. at 1863 (quotation marks and alterations omitted).  But in cases where a video in evidence "obviously contradicts [the nonmovant's] version of the facts, we accept the video's depiction instead of [the nonmovant's] account," Pourmoghani-Esfahani v. Gee, 625 F.3d 1313, 1315 (11th Cir. 2010), and "view[ ] the facts in the light depicted by the videotape," Scott, 550 U.S. at 380–81, 127 S. Ct. at 1776.

6

III.

A.

The estate contends that Williams is not entitled to qualified immunity because he used excessive force when he shot Shaw. "Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." Andujar v. Rodriguez, 486 F.3d 1199, 1202 (11th Cir. 2007) (quotation marks omitted). Because the estate does not dispute that Williams was acting within the scope of his discretionary authority when he shot Shaw, it must show that qualified immunity is otherwise inappropriate. Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002).

To overcome the qualified immunity defense, the estate must satisfy a two step inquiry. It must first prove that the facts alleged, construed in the light most favorable to it, establish that a constitutional violation did occur. Smith, 834 F.3d at 1291. And it must also show that law existing at the time the conduct occurred clearly established that the conduct violated the constitution. Pearson v. Callahan, 555 U.S. 223, 232–36, 129 S. Ct. 808, 816–18 (2009).

"We analyze a claim of excessive force under the Fourth Amendment's objective reasonableness standard." Oliver v. Fiorino, 586 F.3d 898, 905 (11th

Cir. 2009) (quotation marks omitted).  That means we determine whether the

seizure was "objectively reasonable . . . from the perspective of a reasonable

officer on the scene."[4]  Smith, 834 F.3d at 1294 (quotation marks omitted).  The

amount of force used to affect the seizure must be reasonably proportionate to the

need for that force.  Lee, 284 F.3d at 1198.  We balance several factors on that

scale.  See Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989).

The decisive one here is the threat of physical harm that Shaw posed at the time he

was shot.  The issue is whether an officer in Williams' position reasonably could

have believed that Shaw posed a serious threat when he was close to and

advancing on Williams, had a hatchet in his hand, and had ignored more than two

dozen orders to drop the weapon.[5]  See Penley v. Eslinger, 605 F.3d 843, 851 (11th

Cir. 2010) ("In this case, the reasonableness analysis turns on the second of these

factors:  presence of an imminent threat.").

The estate contends that summary judgment should not have been granted

because there is a genuine issue of material fact about whether Shaw had raised the

---

[4] There is no dispute that Williams' shooting of Shaw constituted a "seizure."  See Tennessee v. Garner, 471 U.S. 1, 7, 105 S. Ct. 1694, 1699 (1985).

[5] We also consider "the severity of the crime at issue . . . , and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight."  Graham, 490 U.S. at 396, 109 S. Ct. at 1872.  While neither of those factors is present in this case, they are not required either. If a reasonable officer could have believed that under the circumstances Shaw posed a threat of inflicting serious injury or death on him, the shooting was objectively reasonable regardless of whether Shaw had already committed a crime or was resisting or attempting to evade arrest.  See Garner, 471 U.S. at 11, 105 S. Ct. at 1701 (explaining that the use of deadly force is not unconstitutional "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others").

hatchet in his hand when Williams shot him. And if he hadn't, the estate argues that no officer reasonably could have believed that Shaw posed an immediate threat to Williams or others. Given the light in which we must view the evidence at this stage of the proceeding, we assume that the factual premise of that syllogism is correct: that Shaw did not raise the hatchet he was holding. But the legal premise — that no reasonable officer could have feared serious injury or death unless the hatchet-holding hand was raised up at the time — is wrong.

The reasonableness of the shooting depends on the totality of the circumstances. Garrett v. Athens-Clarke County, 378 F.3d 1274, 1280 (11th Cir. 2004). Shaw was mentally ill and dangerous. Williams had been warned moments before that Shaw "would fight [him] in a minute." And Shaw had been reported for threatening customers with a knife at the same Church's Chicken only a few days before. On this occasion Shaw presented a clear danger. He was an armed and noncompliant suspect who had ignored more than two dozen orders to drop the hatchet. At the time he was shot, Shaw was advancing on Williams with hatchet in hand. He was close to him — within a few feet — and was getting closer still, yelling at Williams to "Shoot it!" Shaw could have raised the hatchet in another second or two and struck Williams with it. Whether the hatchet was at Shaw's side, behind his back, or above his head doesn't change that fact. Given those circumstances, a reasonable officer could have believed that Shaw posed a threat of

serious physical injury or death at that moment.[6]  A reasonable officer could have also concluded, as Williams apparently did, that the law did not require him to wait until the hatchet was being swung toward him before firing in self-defense.

Instead of clearly establishing the law against Williams, binding precedent clearly establishes it in his favor.  See Singletary v. Vargas, 804 F.3d 1174, 1183 (11th Cir. 2015) ("[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect.") (quoting Long v. Slaton, 508 F.3d 576, 581 (11th Cir. 2007)); Jean-Baptiste v. Gutierrez, 627 F.3d 816, 821 (11th Cir. 2010) ("Regardless of whether [the suspect] had drawn his gun, [his] gun was available for ready use, and [the officer] was not required to wait and hope for the best [before using deadly force to stop him].") (quotation marks omitted); Garczynski v. Bradshaw, 573 F.3d 1158, 1169 (11th Cir. 2009) ("[W]here orders to drop [a] weapon have gone unheeded, an officer is not required to wait until an armed and dangerous felon has drawn a bead on the officer or others before using deadly force.") (quotation marks omitted); see also Smith, 834 F.3d at 1294–95 (concluding that it was reasonable for officers to believe that a suspect who was carrying a knife and refused to comply with orders to disarm himself posed an immediate threat to the officers' safety); Blanford v. Sacramento County, 406 F.3d 1110, 1116–19 (9th Cir. 2005)

_____

[6] The estate asserts that when the shot was fired Williams was walking towards Shaw, but the video clearly shows that he was not.  See Scott, 550 U.S. at 380–81, 127 S. Ct. at 1776.

10

(holding that officers did not use excessive force in shooting a suspect carrying a sword after the suspect, who was behaving erratically, refused to comply with orders to drop the sword, even though he had not actually threatened anyone with the weapon).[7]

In cases involving excessive force claims it is doctrinal gospel that we do not view an officer's actions with "the 20/20 vision of hindsight," Jones v. Fransen, 857 F.3d 843, 852 (11th Cir. 2017) (quotation marks omitted), and that we make special allowance for them in "tense, uncertain, and rapidly evolving" situations, Penley, 605 F.3d at 850. Even with the benefit of hindsight and without making any special allowance, we would not find that Williams violated clearly established Fourth Amendment law. The shooting of a mentally ill man was tragic, as such shootings always are, but tragedy does not equate with unreasonableness.

B.

The estate next contends that the district court improperly granted summary judgment in favor of the defendants on the merits of the § 1983 false arrest claim.[8]

---

[7] In addition to arguing that Shaw had not raised the hatchet at the time he was shot, the estate points to some other purported factual disputes that it contends should be resolved in its favor at this stage: whether Shaw had the hatchet when he tried to enter the Church's Chicken, and whether Shaw was "hollering and yelling" in the abandoned laundromat when the officers came onto the scene. But both of those facts are immaterial to our conclusion. Another fact the estate disputes — whether Shaw lunged at Williams when he was shot — we have resolved in the estate's favor, as we must, see Tolan, 134 S. Ct. at 1863, but it does not change our conclusion either.

[8] The estate also contends that the district court improperly granted summary judgment for the defendants on its § 1983 false imprisonment claim. But it mentions that argument only in

11

It argues that before the shooting occurred Shaw was arrested when Williams trained his gun on him as Shaw exited the laundromat.  But we have said time and time again that "the fact that police . . . draw their weapons does not, as a matter of course, transform an investigatory stop into an arrest."  United States v. Blackman, 66 F.3d 1572, 1576 (11th Cir. 1995).  Simply because Williams did so here after he saw Shaw pick up the hatchet did not transform this stop into an arrest either.  Id.; see also United States v. Aldridge, 719 F.2d 368, 371 (11th Cir. 1983) ("The use of a gun in connection with a stop is permissible when the officer reasonably believes it is necessary for his protection."); cf. Courson v. McMillian, 939 F.2d 1479, 1492 (11th Cir. 1991) ("[T]he use of a particular method to restrain a person's freedom of movement does not necessarily make police action tantamount to an arrest, and . . . police may take reasonable action, based upon the circumstances, to protect themselves . . . .") (quotation marks and alterations omitted).  Without an arrest, there can be no claim for false arrest.  See Brown v. City of Huntsville, 608 F.3d 724, 734 (11th Cir. 2010) (defining a § 1983 claim for false arrest as "an arrest without a warrant and lacking probable cause") (emphasis added).  As a result, the district court did not err in granting summary judgment to the defendants

---

its issue statement without further support, so it is abandoned.  Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority.").

12

on the estate's false arrest claim.[9]

## IV.

The estate contends that the district court erred by concluding state agent immunity shields Williams from its state law claims.  Alabama law provides every police officer with "immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties."  Ala. Code § 6–5–338(a).  Discretionary functions are those "as to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances."  Sheth v. Webster, 145 F.3d 1231, 1239 (11th Cir. 1998) (quotation marks omitted) (applying Alabama law).  That includes acts arising from the "enforcement of the criminal laws of the State."  Ex parte Butts, 775 So. 2d 173, 178 (Ala. 2000) (quotation marks omitted); see also Grider v. City of Auburn, 618 F.3d 1240, 1268 (11th Cir. 2010) ("Police

---

[9] The estate also argues that even before the shooting occurred, Williams violated Shaw's Fourth Amendment rights by trying to stop and speak with him.  That argument borders on the frivolous.  When a person refuses to submit to an officer's display of authority, there is no Fourth Amendment seizure before a shooting.  Menuel v. City of Atlanta, 25 F.3d 990, 995 (11th Cir. 1994) (holding that a person who is "intransigent and . . . neither yield[s] to physical force . . . nor submit[s] to a display of authority" before a shooting is not "seized either in the Fourth Amendment sense or in the everyday sense").  Even with the greatest demonstration of police authority (aiming a gun at him), Shaw ignored the officers and walked away.  For that reason we reject any argument that Shaw was unconstitutionally arrested before the shooting.  And while a claim that a plaintiff was unconstitutionally stopped may differ from an unconstitutional or false arrest claim, the fact that Shaw did not stop also forecloses a seizure claim based on a stop short of an arrest.

investigations and arrests usually are considered discretionary functions within the line and scope of law enforcement duties for the purposes of discretionary-function immunity.") (quotation marks and alterations omitted) (applying Alabama law). To survive summary judgment, the estate must show that Williams either "failed to discharge [his] duties pursuant to detailed rules or regulations," or that he "acted willfully, maliciously, fraudulently, in bad faith, beyond his authority, or under a mistaken interpretation of the law" in shooting Shaw. Butts, 775 So. 2d at 178. The estate fails to make either showing.

To begin with, there is no evidence Williams ran afoul of or failed to follow any detailed rules or regulations. See Ex parte Mason, 146 So. 3d 9, 12–13 (Ala. 2013). The only evidence the estate offers is testimony about what an officer "probably would[ ] have" done or "usually" does when approaching a suspect or dealing with the mentally ill. Without any "hard and fast rule" to point to, the decisions Williams made in those circumstances are clearly discretionary. Sheth, 145 F.3d at 1239.

There is also no evidence that Williams "acted with malice in shooting Shaw." Determining whether an officer's use of force was malicious for state agent immunity purposes requires a subjective assessment of the officer's state of mind at the moment force was used. See Ex parte Essary, 992 So. 2d 5, 9 (Ala. 2007) ("[W]anton or willful misconduct is characterized as such by the state of

14

mind with which the act or omission is done or omitted.") (quotation marks omitted).  The estate argues that Williams shot Shaw "not because he felt his life was threatened but out of ego due to Shaw's defiance."

The video footage forecloses that argument.   At the fatal moment, Williams was confronted with an armed, erratic, and noncompliant suspect who was only a few feet away from him and moving closer, yelling for Williams to "Shoot it! Shoot it!"  As we explained earlier, an objective officer in Williams' position could believe that Shaw was an immediate and deadly threat.  There is no evidence in the record indicating Williams' subjective belief was different.

The estate's other argument — that Williams acted beyond his authority by pursuing Shaw for a misdemeanor charge committed outside his presence — also fails.  The officers' investigation and questioning of Shaw was an attempt to prevent him from harming someone with the hatchet he was wielding, which is clearly within their authority.  Butts, 775 So. 2d at 178 (stating officers have the authority to "enforce[ ] . . . the criminal laws of the State") (quotation marks omitted).

For those reasons, Williams is entitled to state agent immunity on all of the estate's state law claims.[10]  See Sheth, 145 F.3d at 1239; Butts, 775 So. 2d at 178.

---

[10] The estate also contends that the district court erred in rejecting Shaw's state law false arrest and false imprisonment claims on the ground that "Shaw was not arrested."  It offers no support for that argument besides the conclusory claim that "[u]nder Alabama law, Williams'

15

Williams' immunity renders Riley and the City immune as well.  Ala. Code § 6–5–338(a); see also Ex parte Harris, 216 So. 3d 1201, 1216 (Ala. 2016) ("[T]o the extent that we have concluded above that [the government official] was entitled to State-agent immunity, the Town would also be immune from suit.").

**AFFIRMED.**

---

actions constituted an arrest of Shaw."  Because the estate raises that claim only in passing and without support, it is abandoned.  See Sapuppo, 739 F.3d at 681.

MAY, District Judge, concurring in the result:

I agree that binding Eleventh Circuit precedent requires the outcome reached by the Majority. I therefore concur in the result.