[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-14568
Non-Argument Calendar

_____

D.C. Docket No. 2:17-cv-00013-LGW-BWC

LISA VERONICA VARNADORE,

Plaintiff-Appellant,

versus

BRANDON MERRITT,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(July 30, 2019)

Before WILSON, BRANCH, and ANDERSON, Circuit Judges.

PER CURIAM:

Plaintiff-Appellant Lisa Veronica Varnadore ("Varnadore"), individually and in her representative capacities as the administratrix of her deceased son Joshua Foskey's ("Foskey") estate and as next friend of Jenna Grayce Foskey, appeals the district court's decision granting Defendant-Appellee Brandon Merritt's ("Merritt") motion for summary judgment. In granting that motion, the district court dismissed Varnadore's 42 U.S.C. § 1983 claim that Merritt violated the Fourth Amendment to the United States Constitution when he shot and killed Foskey, who was unarmed, during a brief roadside encounter. The district court also dismissed several related state law claims on the basis of official immunity.

We have closely reviewed the record in this case, including video taken from the dashboard camera in Merritt's patrol car, audio recordings of 911 calls, and audio recordings of radio correspondence between Merritt and a 911 operator. We have also carefully reviewed the parties' briefs and considered the relevant legal standards. Following this review, we conclude that Merritt is entitled to qualified immunity because video evidence of the shooting and the surrounding circumstances makes it clear that no reasonable jury could find that Merritt lacked an objectively reasonable basis for using deadly force against Foskey under the circumstances of this tragic case. We also conclude that the district court did not err when it dismissed Varnadore's state law claims. Consequently, we affirm the district court's decision granting Merritt's motion for summary judgment.

2

## I. FACTUAL BACKGROUND

We assume the parties are familiar with the record of this case and recount the facts and procedural history in this opinion only the extent necessary to provide context for our decision. The events giving rise to this appeal occurred on the morning of May 22, 2014. About 9:00 a.m. that day, Varnadore called 911 to request an ambulance because Foskey, her 34-year-old son, was locked inside his pickup truck outside her home. He was asleep and sweating profusely. On a second call shortly thereafter, Varnadore reported to the 911 operator that Foskey had awakened and "took off in the truck." She also said he was "staggering around and talking crazy" and that a "needle had fallen out of the truck." Finally, Varnadore reported to the 911 operator that Foskey told her before he left: "I'm not going to jail, I want to die."

Merritt, then a sheriff's deputy in Jeff Davis County, was dispatched to Varnadore's residence. He arrived in the area shortly before 9:15 a.m. just as Foskey's truck spun out onto the two-lane highway fronting Varnadore's home. Merritt activated the blue lights on his patrol car, informed the 911 center he had seen the truck, and began to pursue Foskey. During the two-minute chase that followed, all of which is captured on Merritt's dashboard camera, Merritt's patrol car reached speeds of 100 miles per hour or more. Foskey's truck was at times "all

3

over the road," and he drove in the wrong lane for several seconds shortly after an oncoming car passed going the opposite direction.

Merritt caught up with Foskey just as the truck returned to the correct lane. The two vehicles crossed a small bridge and Foskey slammed on his brakes, bringing the truck to a sudden and forceful stop. The two left wheels of the truck came to rest near the white line marking the right shoulder of the road, and the right side of the truck was parked in the grass alongside a dense tree line next to the road. Merritt stopped his patrol car about sixteen yards behind Foskey's truck and positioned himself behind the open driver's side door of his patrol car. By now, the 911 operator had informed Merritt that Foskey was under the influence and suicidal.

Merritt's dashboard camera also captured the brief roadside encounter that followed. A moment after Merritt's patrol car comes to a complete stop, Foskey is shown swinging open the driver-side door of his truck. He then immediately steps out of the truck and faces his body toward Merritt's patrol car (with his back to the truck's open driver-side door). Foskey then stares in Merritt's direction for a few seconds as he appears to reach around inside the truck as if grasping for something. Although the video from Merritt's dashboard camera did not record any audio, Merritt's testimony reveals—and Varnadore does not dispute—that Merritt twice

4

told Foskey to "show me your hands" (once before drawing his handgun and once after).  According to Merritt, Foskey yelled back at him and said "no."

The dashboard camera then shows Foskey's head and upper body disappear from view as he leans inside the truck.  The center console of the truck appears to open.[1]  Two to three seconds later, Foskey jumps from the truck—facing Merritt's patrol car—and pulls his right arm across his body.  His right hand moves quickly from the left side of his torso near his beltline upward and toward Merritt.  Several unidentified objects are visible in his right hand.  Merritt fires a single shot from his handgun.[2]  The shot strikes Foskey in the neck and he falls to the ground.

Only twenty seconds passed from the time Merritt stopped his car behind Foskey until the time he fired his handgun.  Aside from having his handgun trained on Foskey and instructing him at least twice to show his hands, Merritt gave no express warning that he would use deadly force.  It was later discovered that Foskey was unarmed.  The unidentified objects in his right hand were a CD case and two pieces of paper.  Foskey eventually died at the scene.

## II.  PROCEDURAL BACKGROUND

Varnadore filed an action in the United States District Court for the Southern District of Georgia seeking damages under 42 U.S.C. § 1983 for a violation of the

---

[1] Merritt later testified that he did see Foskey "flip the console."

[2] Merritt also testified that, at this point in time, he was "backing up" toward the driver-side taillight of his patrol car in an effort to seek safe cover.

5

Fourth Amendment to the United States Constitution.  She also alleged several state law claims and asked the district court to exercise its supplemental jurisdiction to consider those claims.  The parties conducted limited discovery, and Merritt moved for summary judgment on grounds that he did not use excessive force because the act of shooting Foskey was objectively reasonable under the circumstances.  He also argued he was entitled to qualified immunity because case law had not clearly established that the force he used under the circumstances was unlawful.  As to the state law claims, Merritt argued that he was entitled to official immunity.

The district court granted Merritt's motion for summary judgment.  Relying heavily on the video evidence taken from Merritt's dashboard camera, the district court concluded that Merritt did not use excessive force in violation of the Fourth Amendment because "it was objectively reasonable for [Merritt] to believe that he was in a sho[o]t or be shot situation."  In particular, the district court first found that Foskey's erratic driving during the traffic chase potentially put others at risk but would not alone support the use of deadly force because it would not put a reasonable officer on notice that Foskey might be armed or violent.  It then focused on Foskey's behavior during the roadside encounter and concluded that he "would have appeared to a reasonable officer to be gravely dangerous."  Among other things, the district court emphasized the manner in which "Foskey quickly [swung]

6

his body around in one fast motion, out of the car," and also how "Foskey's hand swung up from the waist, across his body, and directly toward Deputy Merritt like someone raising a handgun about to fire."  Finally, the district court noted that Foskey "refused to comply with Deputy Merritt's order to show his hands," instead hiding his hands in the truck and opening the center console.

The district court also exercised its discretion to decide Varnadore's state law claims.  It did so primarily at the insistence of Varnadore's counsel, who acknowledged at a hearing before the district court that "if you [the district court] think the officer acted reasonably under federal law then I don't think you can say that the officer shot Mr. Foskey for no reason which would kill the Georgia claim." The district court concluded that Merritt was entitled to official immunity under Georgia law because he acted reasonably and without "actual malice" in this case. This appeal followed.

### III. ARGUMENTS ON APPEAL

On appeal, Varnadore argues that summary judgment was inappropriate because a reasonable jury could find that Merritt's use of deadly force against Foskey was not objectively reasonable under the circumstances.  In making this argument, Varnadore points to the fact that Merritt had interacted with Foskey before and that Foskey had not acted aggressively toward Merritt during those encounters.  She also points out that the 911 operator did not inform Merritt that

7

Foskey was armed and that Merritt did not ask whether he might be.  She notes that Merritt had an unobstructed view of Foskey in broad daylight, and that he should have clearly seen that Foskey did not have a gun in his hand.  She argues that Merritt was protected by his patrol car when he shot, and that it was not necessarily reasonable for Merritt to think Foskey was capable of shooting him given the fact that Foskey was under the influence of narcotics.  She contends Foskey was not resisting arrest and, even if he were, Merritt never gave a warning that he planned to use deadly force.  In sum, Varnadore insists that Merritt's subjective belief that Foskey had a gun and might shoot him is insufficient to establish probable cause for the use of deadly force.  As was the case before the district court, Varnadore agrees that her state law claims should rise or fall with the federal § 1983 action.

In response, Merritt argues that the district court correctly determined—and the video evidence clearly shows—that his use of force was objectively reasonable. He contends that Foskey would have appeared to be gravely dangerous to any reasonable officer faced with the circumstances depicted in the video taken from Merritt's dashboard camera.  In the alternative, Merritt argues that he is entitled to qualified immunity because case law has not clearly established a bright-line rule that would have put him on notice that his actions violated the Fourth Amendment.

8

## IV.  STANDARD OF REVIEW

We review <u>de novo</u> a district court's grant of summary judgment, applying the same legal standards as the district court.  <u>Stephens v. DeGiovanni</u>, 852 F.3d 1298, 1313 (11th Cir. 2017).  "Summary judgment is appropriate if the evidence before the court demonstrates that 'there is no genuine dispute of material fact and that the moving party is entitled to judgment as a matter of law.'"  <u>Taylor v. Hughes</u>, 920 F.3d 729, 732 (11th Cir. 2019) (quoting Fed. R. Civ. P. 56(a)).  In determining whether summary judgment is appropriate, "we view all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  <u>Whatley v. CNA Ins. Cos.</u>, 189 F.3d 1310, 1313 (11th Cir. 1999).  In cases involving a qualified immunity defense, "this usually means adopting . . . the plaintiff's version of the facts."  <u>Scott v. Harris</u>, 550 U.S. 372, 378, 127 S. Ct. 1769, 1775 (2007).  However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  <u>Id.</u> at 380, 127 S. Ct. at 1776.  This is especially the case when clear video evidence is in the record.  Indeed, when there are no allegations or indications that video evidence has been doctored, or that the video shows something different than what actually happened, the Supreme Court

9

has indicated that we should "view[] the facts in the light depicted by the videotape." Id. at 378, 380–81, 127 S. Ct. at 1775–76.

## V.  DISCUSSION

The district court did not err when it granted Merritt's motion for summary judgment because no reasonable jury could conclude that Merritt lacked an objectively reasonable basis for using deadly force against Foskey.  In the light of the video evidence of Merritt's brief but lethal encounter with Foskey on May 22, 2014, it is clear to us that any reasonable officer in Merritt's position would have viewed Foskey as an immediate and serious threat to his or her own safety.

Qualified immunity protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[3] Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982).  The qualified immunity defense balances "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009).  This permits officials to perform their work without fear of liability,

---

[3] There is no question in this case that Merritt was acting in his discretionary capacity as a deputy sheriff when the challenged shooting occurred.

protecting "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096 (1986).

Once asserted, a plaintiff must make two showings to overcome an official's qualified immunity defense. See Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1199–1200 (11th Cir. 2007). The plaintiff must show (1) that the official violated a constitutional right, and (2) that the right was "clearly established." Id. This Court is now "permitted to exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson, 555 U.S. at 236, 129 S. Ct. at 818. Because we conclude that Merritt did not violate Foskey's Fourth Amendment rights in this case, it necessarily follows that there was no violation of a clearly established right.

The Fourth Amendment provides a "right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. This "freedom from unreasonable searches and seizures encompasses the right to be free from excessive force during the course of a criminal apprehension." Oliver v. Fiorino, 586 F.3d 898, 905 (11th Cir. 2009) (citing Graham v. Connor, 490 U.S. 386, 394–95, 109 S. Ct. 1865 (1989)); Mercado v. City of Orlando, 407 F.3d 1152, 1156 (11th Cir. 2005)). Thus, all claims that a law enforcement official has used excessive force in apprehending a suspect are analyzed under the Fourth

11

Amendment's "objective reasonableness" standard, meaning that the question we must ask "is whether the officer['s] actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397, 109 S. Ct. at 1872.

The force used to affect the seizure "must be reasonably proportionate to the need for that force." Shaw v. City of Selma, 884 F.3d 1093, 1099 (11th Cir. 2018). Three nonexclusive factors guide this totality-of-the-circumstances inquiry, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer[] or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396, 109 S. Ct. at 1872. These three factors serve only as a guide, and it is not necessary in all cases for an officer to show that all three factors weigh in his or her favor to establish that the force ultimately used was reasonably proportionate to the need for force. See Shaw, 884 F.3d at 1098–1100 & n.5 (noting that "[t]he reasonableness of the shooting depends on the totality of the circumstances" and concluding that, in a case involving a mentally ill victim wielding a hatchet, the outcome of the appeal "turn[ed] on the second of these factors: presence of an imminent threat").

As in Shaw, the outcome of this appeal turns on the presence of an immediate threat. In focusing our inquiry on the second of the three factors

12

outlined above (i.e., the immediacy of a serious threat), the issue we are called upon to determine is whether an officer in Merritt's position reasonably could have believed that Foskey posed a serious threat when he ignored Merritt's orders to show his hands and instead reached around inside his truck, jumped out of his truck, and then quickly raised his right hand toward Merritt and away from his beltline while holding unidentified objects. Under the totality of the circumstances of this case—and as evidenced by the clear video evidence from Merritt's dashboard camera—we hold that a reasonable officer in Merritt's position reasonably could have believed that Foskey posed a serious threat to his or her own safety.

To begin, Foskey drove erratically during a brief traffic pursuit and brought his truck to a sudden and forceful stop. He quickly exited his vehicle and stared in Merritt's direction. Ignoring Merritt's orders to show his hands, Foskey reached around inside his truck and appeared to be grasping for something. He also appeared to open the center console inside his truck. By this time, 911 operators had also informed Merritt that Foskey was under the influence and suicidal. Although it may be that Merritt would not have had an objectively reasonable basis for using deadly force against Foskey at this moment in time (i.e., before he

13

jumped out of his truck),[4] what happens next is, in the light of everything that came before, most critical to our disposition of this appeal.

Next, the video clearly shows Foskey abruptly jumping out of his truck, facing in the direction of Merritt's patrol car, and quickly raising his right arm toward Merritt and away from his beltline as if pulling a gun from his waist. Importantly, Varnadore does not argue on appeal that the video taken from Merritt's dashboard camera has been doctored, or that the video shows something other than what actually happened. Instead, she argues that Merritt should not have fired because he had previously interacted with Foskey; or because Merritt could see clearly; or because with a couple more steps, Merritt could have been safe behind the patrol car; or because Foskey was under the influence and could not have fired an accurate shot even if he had possessed a gun; or because Merritt did not ask the 911 operator if Foskey was armed. Although one or more of these observations may be true, "[s]peculation does not create a genuine issue of fact" for purposes of summary judgment. Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005). Moreover, in the context of cases involving allegations of excessive force, after-the-fact "[r]econsideration will nearly always reveal that something different could have been done if the officer knew the future before it

---

[4] We expressly decline to decide whether or not that is true because Foskey's behavior in the seconds that follow his reaching around inside the truck informs our decision in this case.

14

occurred." Carr v. Tatangelo, 338 F.3d 1259, 1270 (11th Cir. 2003). "This is what we mean when we say we refuse to second-guess the officer." Id. Thus, in the light of the clear video evidence of Foskey's behavior in the minutes (and in particular the seconds) before Merritt shot him, Varnadore's arguments are insufficient to create a genuine issue of material fact that would defeat Merritt's motion for summary judgment. The video evidence makes it clear to us that no reasonable jury could conclude that Merritt lacked an objectively reasonable basis for believing that Foskey posed a serious threat to his own safety, and the district court did not err in granting Merritt's motion for summary judgment on that basis.[5]

This conclusion is not altered by the fact that Foskey turned out to be unarmed. As noted above, "[i]n cases involving excessive force claims it is doctrinal gospel that we do not view an officer's actions with the 20/20 vision of hindsight." Shaw, 884 F.3d at 1100 (citation and internal quotation marks omitted). Courts considering an alleged use of excessive force must also consider

---

[5] Although it is not necessary in this case to weigh all three of the Graham factors to decide in Merritt's favor, see Shaw, 884 F.3d at 1099 n.5, we note that Foskey's refusal to comply with Merritt's orders to show his hands further weighs in favor of affirming the district court's decision. Under the circumstances, Foskey's refusal to show his hands probably means that he was "actively resisting arrest" when Merritt shot him. See Graham, 490 U.S. at 396, 109 S. Ct. at 1872. But even if he was not resisting arrest as a matter of law, the particular manner in which Foskey refused to cooperate with Merritt is crucial to our reasonableness analysis. Foskey did not simply refuse Merritt's orders to show his hands. Instead, he reached inside the cabin of his truck, unexpectedly jumped out of the cabin, and quickly raised his hand toward Merritt while holding something in his hand. Thus, although we focus our attention primarily on Foskey's behavior as evidenced by the video taken from Merritt's dashboard camera, it is not entirely irrelevant to our objective reasonableness inquiry that Foskey acted in such a manner despite Merritt's orders to show his hands.

15

that officers are often called upon to act "in tense, uncertain, and rapidly evolving situations." Id. (citation and internal quotation marks omitted).  Given these realities, this Court has held that an officer who uses deadly force may still be entitled to qualified immunity even if he mistakenly believed the suspect was armed so long as that belief was reasonable under the circumstances.  See, e.g., Penley v. Eslinger, 605 F.3d 843, 846, 851–54 (11th Cir. 2010) (affirming district court's grant of qualified immunity to officer who shot and killed fifteen-year-old student after student took classmate hostage and later pointed what turned out to be a toy gun at the officer during a standoff inside the school).

Thus, even though we now know that Foskey had retrieved a CD case and two pieces of paper from inside the cabin of his truck—and that he was raising those items (and not a gun) from his beltline and toward Merritt after exiting his truck—the relevant inquiry remains whether, even though he did not actually have a gun, would Foskey "have appeared to reasonable police officers to have been gravely dangerous[?]" Id. at 851.  Our precedents—together with Merritt's dashboard camera video—make it clear that reasonable police officers would have viewed Foskey as gravely dangerous given his behavior before and during the twenty-second roadside encounter.

We also decline to disturb the district court's decision on grounds that Merritt did not give Foskey a warning that he planned to use deadly force.  Even

16

assuming that Merritt's orders demanding that Foskey show his hands (the second of which was preceded by Merritt aiming his handgun at Foskey) would not have been sufficient to warn Foskey that Merritt intended use deadly force, this Court has expressly "decline[d] . . . to fashion an inflexible rule that, in order to avoid civil liability, an officer must always warn his suspect before firing—particularly where, as here, such a warning might easily have cost the officer his life."  Carr, 338 F.3d at 1269 n.19 (citation omitted).  Moreover, the facts of this case are easily distinguishable from the facts in Tennessee v. Garner, 471 U.S. 1, 105 S. Ct. 1694 (1985) (requiring a warning before deadly force is used under certain circumstances), which involved a fleeing, unarmed suspect who did not reasonably appear to pose an immediate threat to the officer.  See Penley, 605 F.3d at 854 n.6 (distinguishing Garner in the context of a case, more like this one, where the suspect "posed a real threat to the lives of officers").  Even assuming arguendo that Garner is factually similar to and thus governs this case, we would still affirm the district court because it would not have been "feasible" for Merritt to warn that he intended to use deadly force against Foskey in the split-second after Foskey jumped from his truck.

17

## VI.  CONCLUSION

In the light of all of the attendant circumstances of this case, as they might be viewed by a reasonable officer in Merritt's position,[6] we conclude that Merritt did not use excessive force in violation of Foskey's Fourth Amendment rights.  In reaching this conclusion, we emphasize the manner in which Foskey initially exited his truck (after being pursued at high speeds), then reached around inside the truck (despite orders to show his hands), and then quickly jumped out of the truck (raising several unidentified objects from his beltline toward Merritt as if pulling a gun from his waist).  In addition to the clear video evidence, we further consider that an officer in Merritt's position would have witnessed all of this behavior knowing that Foskey was under the influence and suicidal.  Taken together, these facts clearly indicate that a reasonable officer would have been justified in believing that Foskey posed an immediate and serious threat to his or her own safety.  Because he did not violate Foskey's Fourth Amendment rights, Merritt is entitled to qualified immunity.[7]  The order of the district court granting

---

[6] To be clear, we do not decide in Merritt's favor because of his testimony that he "just thought [Foskey] had a gun."  Rather, we decide in Merritt's favor because, based on the record before us, it was objectively reasonable for an officer in Merritt's situation to believe that Foskey had a gun and thus posed an immediate and serious threat to his safety.

[7] Given this conclusion, and given Varnadore's admissions before the district court and this Court that the federal and state law claims should rise or fall together, we also hold that the district court did not err when it granted Merritt's motion for summary judgment with respect to the state law claims asserted in this case.

Merritt's motion for summary judgment and dismissing Varnadore's claims is therefore

**AFFIRMED.**[8]

---

[8] Any other arguments asserted on appeal by Varnadore are rejected without need for further discussion.