[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-13979

Non-Argument Calendar

_____

BRANDIE ROBINSON,
as personal representative of the estate of Crystal Ragland,

Plaintiff-Appellant,

*versus*

CITY OF HUNTSVILLE,
OFFICER BRETT COLLUM,
in his individual and official capacity,
OFFICER JONATHAN HENDERSON,
in his individual and official capacity,
HUNTSVILLE APARTMENT GROUP LLC,

2                    Opinion of the Court                    21-13979

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 5:21-cv-00704-AKK

_____

Before JORDAN, ROSENBAUM, and NEWSOM, Circuit Judges.

PER CURIAM:

This case involves the tragic death of Crystal Ragland, a decorated U.S. Army veteran who suffered from PTSD and traumatic brain injury.  On May 30, 2019, Ragland was shot multiple times and killed by two City of Huntsville police officers—Brett Collum and Jonathan Henderson—soon after they arrived at her apartment in response to 911 calls that she was armed and acting erratic.

Brandie Robinson, as personal representative of Ragland's estate, filed a lawsuit under 42 U.S.C. § 1983 claiming in part that the officers used constitutionally excessive force, and that the City failed to adopt and implement appropriate use-of-force policies for interacting with mentally ill citizens.  The district court granted the defendants' motion to dismiss, concluding that the officers' use of deadly force was reasonable under binding precedent.

Robinson appeals, making essentially two arguments.  First, she says that the district court erred in considering the officers'

body-worn camera footage ("bodycam footage"), which was attached to the defendants' motion to dismiss, without converting the motion into a motion for summary judgment. And second, she maintains that, even if the footage is considered, she still pled a plausible Fourth Amendment violation. After careful review, we must reject these arguments and affirm.

## I.

### A. Factual Allegations

We draw the facts from the operative second amended complaint, accepting the well-pleaded factual allegations as true. On May 30, 2019, Officers Collum and Henderson were dispatched to an apartment complex in Huntsville, Alabama, in response to a "series of 911 calls about an erratic individual named Crystal Ragland who may have been armed." When they arrived, the officers spoke with the apartment manager, "who described Ragland as having a gun and who said other tenants stated she was waving a gun." The manager also said that Ragland was a veteran who likely suffered from PTSD and traumatic brain injury, and that she had been unstable in recent weeks and staring out her patio window. The officers responded that they would "obviously . . . try and get her some help."

But when the officers arrived at Ragland's apartment, they failed to "utilize any de-escalation" or crisis-intervention techniques for addressing subjects suffering from mental illness. Instead, they approached her with guns drawn and yelled verbal

commands that "amplified . . . her anxiety and PTSD." Within a minute of knocking on her front door, Collum and Henderson had "shot and struck Ragland with multiple gunshot wounds from which she later died."

The complaint "anticipate[ed] that the Defendants will argue that Ragland was reaching for a gun in her pocket." But it alleged that the officers' bodycam footage "does not clearly show the gun dropping to the ground or being visible prior to the shooting." It admits that "[v]ideo footage shows a gun on the ground in the aftermath of the shooting," even if the gun was later determined to be incapable of firing.

## B. Motions to Dismiss and Bodycam Footage

The defendants filed motions to dismiss and submitted the bodycam footage from both officers. They argued that the footage could be considered at the motion-to-dismiss stage and showed that their actions were objectively reasonable. Robinson responded that the footage could not be considered without converting the motion to dismiss to a motion for summary judgment and permitting additional discovery. She also maintained that the video did not erase material factual disputes about the shooting.

The bodycam footage—consisting of two videos, one from each officer, of differing quality—shows the officers approach Ragland's ground-floor apartment after speaking to the apartment manager. Collum took position near the patio door while Henderson went to the front door. Henderson knocked several times and

said, "Hey Crystal, Huntsville police, can we talk to you real quick?"  He then backed away and pointed his gun at the door.

Instead of answering the front door, Ragland went to the patio door where she encountered Collum, who told Ragland to put her hands in the air with his gun drawn but not aimed.  Ragland raised her hands and said she did not have a weapon, and Collum asked her to step outside onto the patio.  Ragland lowered her hands and asked, "Why are you pointing your weapon at me?"  Collum responded by telling Ragland twice to "get your hands up," raising his voice, and Ragland then told Collum to "shoot my fucking ass."

Henderson soon joined Collum at the back door.  The officers yelled for Ragland to "get your hands up" and "show us your other hand."  Ragland briefly put her hands above her head as if to comply.  But she then dropped her arms and reached her right hand towards her right front pocket, grasping the handle of what appears to be a handgun.  The officers immediately fired multiple shots at Ragland, who later died of her injuries.  As the second amended complaint indicates, the bodycam footage clearly shows what looks like a gun on the ground just behind and to the side of where Ragland fell.

C.    *Order Granting Motion to Dismiss*

On October 15, 2021, the district court granted the defendants' motion to dismiss.  It found that it could consider the bodycam footage without converting the motion to dismiss to a motion

for summary judgment because it was central to Robinson's claims and its authenticity was not disputed. *See Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002). Then, based on the facts alleged in the second amended complaint and depicted in the bodycam footage, it determined that Robinson failed to state a plausible claim under § 1983.

The district court concluded that the officers did not violate Ragland's Fourth Amendment rights because the use of deadly force was reasonable in response to Ragland's reaching for her gun after displaying erratic behavior and refusing to put her hands up. The court also dismissed the municipal-liability claims against the City for lack of an underlying constitutional violation. The court declined to exercise supplemental jurisdiction over the remaining state-law claims. Robinson appeals.

## II.

We review the grant of a motion to dismiss *de novo*, accepting as true the facts alleged in the complaint and drawing all reasonable inferences in favor of the plaintiff. *Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016). To survive a motion to dismiss, the complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quotation marks omitted). That means the complaint's non-conclusory factual allegations, accepted as true, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "The plausibility standard is

21-13979              Opinion of the Court                    7

not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## A.

We start with the bodycam footage. Ordinarily, we "limit[] our review to the four corners of the complaint." *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010). But under the doctrine of incorporation by reference, courts may also consider evidence attached to a motion to dismiss if it is "referred to in the complaint, central to the plaintiff's claim, and of undisputed authenticity." *Hi-Tech Pharm., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186, 1189 (11th Cir. 2018). Otherwise, though, the evidence cannot be considered without converting the motion to dismiss into a motion for summary judgment and soliciting other evidence. *See Day v. Taylor*, 400 F.3d 1272, 1275–76 (11th Cir. 2005) ("The district court generally must convert a motion to dismiss into a motion for summary judgment if it considers materials outside the complaint.").

Here, Robinson has not shown that the district court erred in considering the bodycam footage in ruling on the motions to dismiss. She does not dispute that the bodycam footage was referenced in the operative complaint and central to her claims. *See Hi-Tech Pharm.*, 910 F.3d at 1189. Instead, she contends that the bodycam footage was not "undisputed" because she disputed the facts which could be observed in or inferred from the footage. But "[i]n this context 'undisputed' means that the authenticity of the document is not challenged," *Day*, 400 F.3d at 1276, not that the

8                    Opinion of the Court                    21-13979

evidence is free from any dispute over its content. We see nothing in the record to suggest that Robinson believes the bodycam footage is not what it purports to be—that is, the video and audio information recorded by the two officers' body-worn cameras during the events on May 30, 2019. *See* Fed. R. Evid. 901(a). Because the "undisputed authenticity" requirement is met, we consider the bodycam footage at the motion-to-dismiss stage, viewing it in the light most favorable to Robinson.[1]

## B.

"Any claim that a law enforcement officer used excessive force—whether deadly or not—during a seizure of a free citizen must be analyzed under the Fourth Amendment's 'reasonableness' standard." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009). This standard requires "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Scott v. Harris*, 550 U.S. 372, 383 (2007) (quotation marks omitted). "The government's interests include

---

[1] Robinson does not directly challenge the application of the incorporation-by-reference doctrine to video evidence like the bodycam footage, nor does she dispute whether the bodycam footage was central to her claims. Because those issues are abandoned, we do not consider them. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680–81 (11th Cir. 2014) (issues not raised on appeal are deemed abandoned).

protecting the safety of the police officers involved as well as the public at large." *Garczynksi*, 573 F.3d at 1166.

The particular facts of each case must be analyzed to determine whether the force used was "objectively reasonable" under the totality of the circumstances. *See Graham v. Connor*, 490 U.S. 386, 396–97 (1989). We consider the officers' conduct "from the perspective of a reasonable officer on the scene," taking into account all of the attendant circumstances. *Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004). Those circumstances are often "tense, uncertain and rapidly evolving, thereby requiring split-second judgments as to how much force is necessary. Because an officer's perspective in the field differs from that of a judge sitting peacefully in chambers, we must resist the temptation to judge an officer's actions with the 20/20 vision of hindsight." *Garczynski*, 573 F.3d at 1167.

"Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, use of deadly force does not violate the Constitution." *Penley v. Eslinger*, 605 F.3d 843 (11th Cir. 2010) (cleaned up); *see also Cantu v. City of Dothan, Ala.*, 974 F.3d 1217, 1230 (11th Cir. 2020) (use of deadly force permitted if the officer "had probable cause to believe at the time she shot him that he posed a threat of serious physical harm or death to the one or more of the officers"); *Hunter v. Leeds, City of*, 941 F.3d 1265, 1279 (11th Cir. 2019) ("It is axiomatic that when an officer is threatened with deadly force, he may respond with deadly force to protect himself.").

In *Shaw*, for example, an officer shot to death a man who had not committed a crime, was not attempting to escape, and was not aggressively resisting arrest. *United States v. Shaw*, 884 F.3d 1093, 1097–98 (11th Cir. 2018). But he was mentally ill, holding a hatchet, and advancing on the officer despite repeated commands to stop. *Id.* at 1096–98. We held that the use of deadly force to protect the officer did not violate the Fourth Amendment in those circumstances. *Id.* at 1100.

Similarly, in *Garczynski*, several officers shot and killed a man who had not committed a crime, was not attempting to escape, and was not aggressively resisting arrest. 573 F.3d at 1161–64. Upon locating the man whom they believed to be armed and suicidal, but without any indication he was a danger to others, the officers used a "dynamic approach" that involved rushing his car, breaking multiple windows, and shouting commands at him to show his hands and drop the gun he was holding. *See id.* When the man brought the gun from his own temple and swung it in the direction of the officers, the officers began shooting. *Id.* at 1167–68. We held that the officers' use of deadly force to protect themselves and other officers did not violate the Fourth Amendment in those circumstances. *Id.* at 1168.

Here, Robinson has not plausibly established that Officers Collum and Henderson violated Ragland's Fourth Amendment right to be free from excessive force. Even accepting the factual allegations as true and viewing the bodycam footage in her favor, we are bound by our precedent to conclude that the officers' use of

deadly force did not violate the Fourth Amendment. The officers responded to reports of an erratic individual who was armed and waving a gun at others, and they learned at the scene that she was a veteran who suffered from PTSD and traumatic brain injury. When they encountered Ragland, she was confrontational and refused commands to put her hands up. While she briefly raised her arms in apparent compliance, she then dropped her arms and reached with her right hand to grab what looked like the handle of a handgun in her right front pocket, at which point the officers began shooting. The officers had no reason to believe that the gun was inoperable at that time. Under our precedent, including *Shaw* and *Garczynski*, the officers reasonably perceived that Ragland's reaching for a gun posed a threat of serious physical harm, and their use of deadly force to protect themselves and each other did not violate the Fourth Amendment. *See Shaw*, 884 F.3d at 1100; *Penley*, 605 F.3d at 852; *Garczynski*, 573 F.3d at 1168.

Robinson maintains that the bodycam footage is unclear as to "what each of the officers reasonably could have seen" before shooting at Ragland, so it was plausible that "an officer from whose vantage point a weapon was not visible shot Ms. Ragland in violation of the Fourth Amendment." But despite quality differences in the videos, and notwithstanding the pattern of Ragland's shorts, the handle of a gun or what looks like a gun is visible in her right front pocket on the bodycam footage from both officers. A gun is also visible on the ground just behind and to the side of Ragland after she fell. The remote possibility that the bodycam footage

does not accurately convey what the officers could see is not enough to defeat a motion to dismiss.  *See Iqbal*, 556 U.S. at 678 (stating that the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully").  Notably, the complaint did not allege that Ragland was unarmed.

In addition, whether Ragland "actually grasped" the gun before she was shot is not material because it does not meaningfully change the threat of serious physical harm presented.  Based on our careful review the bodycam footage, it shows without ambiguity Ragland reaching for what appears to be a gun, in defiance of the officers' commands, given at gunpoint, to put her hands up, following reports that she had been waving the gun at others.  In these tense and dangerous circumstances, our precedent makes it clear the officers were not required to wait and see what she intended to do with the gun before resorting to deadly force.  *See Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) ("[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect.").

Robinson claims that the officers used unreasonable tactics and created the dangerous environment that led to Ragland's death.  In her view, the officers "utter[ly] fail[ed] to deescalate a sensitive mental health crisis."  Indeed, it would be difficult to argue with the district court's observation "that the officers' tactics escalated the situation."  And that is truly troubling.

But even so, we see no viable claim under our precedent. As our cases emphasize, "[o]ur task is not to evaluate what the officers could or should have done in hindsight. The sole inquiry is whether the officer's actions, as taken, were objectively reasonable under all the circumstances." *Garczynski*, 573 F.3d at 1168. As we just explained, the use of deadly force was justified under our precedent in response to Ragland's display of erratic behavior, her defying of officer commands, and her reaching for a gun. *See id.* at 1168–69; *Shaw*, 884 F.3d at 1100. We also note that the tactics used here were more measured than the "dynamic" tactics we upheld under the Fourth Amendment in *Garczynski*, and that case did not involve conduct that was arguably threatening to others, as this one does. 573 F.3d at 1169–70 (rushing an armed, suicidal suspect's car with guns drawn, yelling commands, and breaking windows in order "to prevent a suicide").

Finally, without an underlying constitutional violation, Robinson cannot impose liability on the City under § 1983. *See McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) ("[T]o impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation.").

This decision is not, as Robinson contends, premature or better left to a jury. An evaluation of the reasonableness of the force used is appropriate at this stage because "the question of

whether the force used by the officer . . . is excessive is a pure question of law, decided by the court." *Stephens v. DeGiovanni*, 852 F.3d 1298, 1321 (11th Cir. 2017) (quotation marks omitted).  And here, even when we construe the factual allegations and the bodycam footage in the light most favorable to Robinson, we are unable to conclude that Robinson could establish that the use of deadly force against Ragland, though undoubtedly tragic, was objectively unreasonable under our precedent.  Because she has not stated a plausible claim that Officers Collum and Henderson violated Ragland's right to be free from excessive force, the district court did not err in granting the motions to dismiss.  *See Am. Dental Ass'n*, 605 F.3d at 1289.

For these reasons, we affirm the dismissal of the second amended complaint.

**AFFIRMED.**