[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

————————————————

No. 23-11035

Non-Argument Calendar

————————————————

KENNETH HOWARD,

Plaintiff-Appellant,

*versus*

DEKALB COUNTY,
JORDAN VANCE,
individually,

Defendants-Appellees.

————————————————

Appeal from the United States District Court
for the Northern District of Georgia

D.C. Docket No. 1:22-cv-01550-SCJ

———————————

Before JORDAN, LAGOA, and MARCUS, Circuit Judges.

PER CURIAM:

DeKalb County Police Officer Jordan Vance ("Officer Vance") shot Plaintiff Kenneth Howard ("Plaintiff" or "Howard") -- who was coming at him with a knife -- three times in the chest. Howard survived the shooting, and brought 42 U.S.C. § 1983 claims for excessive force against Officer Vance and DeKalb County ("the County") (together, "the Defendants"), as well as state-law tort claims against Officer Vance. The district court granted the Defendants' motion for judgment on the pleadings. Howard has appealed only the dismissal of his excessive force claim against DeKalb County. After thorough review, we affirm.

**I.**

The relevant background -- as gleaned from the allegations in the complaint and the critical video recordings relied on and undisputed by Howard[1] -- is this. On May 24, 2020, Officer Vance responded to a call at a QuikTrip gas station located on North

---

[1] *See Baker v. City of Madison, Ala.*, 67 F.4th 1268, 1277–78 (11th Cir. 2023); *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002). Notably, Howard does not challenge the district court's decision to consider the videos on a motion for judgment on the pleadings, or argue on appeal that we should not consider them. *See Sapuppo v. Allstate Floridian Ins.*, 739 F.3d 678, 680–81 (11th Cir. 2014) (holding that issues not raised on appeal are deemed abandoned).

Decatur Road, shortly after 6:00 a.m.  Howard was having what the complaint describes as a "mental health episode" and had been pacing outside the gas station for 15 minutes or so.

On arrival, Officer Vance remained in his car for nearly two minutes, during which time Howard stood outside the gas station in full view of Vance, while customers came and went, without interaction.  Officer Vance then walked into the gas station, and along the way, he warned Howard, "by the time I get out [of] this store, you better be gone; if [you're] not gone, we're gonna have a problem."  Once inside, the officer spoke with two gas station employees, one of whom recounted that Howard had removed his pants; that she had told him to put his pants on and asked him to leave; and that Howard had put his pants on in response, but then "just stood there."  Vance confirmed that the employee wanted Howard to leave and exited the gas station to speak with Howard.

Officer Vance walked towards Howard, who was standing by a trash can outside the gas station entrance.  As Vance approached, he directed Howard twice to take his hands out of his pockets.  Howard turned toward Vance, took his right hand out of his pocket and put it behind his back.  The body camera footage shows Howard holding an object in his right hand.  Howard's pants were hanging loosely on his hips; twice, he used both hands to hike them up, and both times, he returned his right hand -- still holding something -- behind his back and out of the officer's view.

Vance then took a few steps away from Howard.  Vance asked one of the QuikTrip employees, who had followed him out

of the gas station, "so, you said he had his pants down, right?"  The employee responded "yes."    Nearly simultaneously, Howard dropped his pants while asking "wanna see?" and took his right hand out from behind his back, revealing -- as the complaint alleges -- what Officer Vance believed to be a knife.  In response, Vance drew his firearm and pointed it at Howard, while the QuikTrip employee began backing away.  Howard -- with pants around his ankles -- waddled towards the officer and away from the QuikTrip entrance, while raising the knife up to eye level with the point facing towards Vance.  At this point, the QuikTrip employee turned and ran back inside the gas station, away from Howard.

Howard continued to walk toward Vance and away from the gas station entrance.  Vance backed away as Howard approached, keeping a steady distance between them.  After a few seconds, Howard stopped, so Officer Vance stopped as well and yelled, "Put the knife down!"  Howard responded, "I'm not puttin' shit down," and again began walking toward Vance, his movement still impeded by his pants around his ankles.  The officer again yelled "put the knife down!" while moving backwards away from Howard, and Howard again declared, "I'm not putting shit down." Vance directed Howard a third time to drop the knife, and, again, Howard refused, saying, "I'm not putting anything down."

Only able to take "baby steps" while his pants were bunched around his ankles, Howard then attempted to take his pants all the way off, struggling at first, and at one point sitting on the hood of Officer Vance's vehicle to aid in his balance.  All the while, Vance

kept his gun trained on Howard while remaining a distance of approximately two parking-lot spaces away, and spoke into his radio, stating "suspect is armed with a knife, comin' at me and is taking off his clothes." He then yelled twice at Howard to "put that damn knife down!" and, as Howard finished pulling his other foot out of the remaining pant leg, Officer Vance yelled "do not come near me!" and again directed Howard to put the knife down.

Once Howard succeeded in fully removing his pants, he continued walking slowly, knife still in hand, toward Officer Vance, who kept a constant distance from Howard by backing up himself. The officer repeatedly yelled at Howard to put the knife down, with increasing urgency. Howard still did not comply. Instead, Howard continued to approach, growing closer to Vance with the knife still in hand, though Howard alleges that Vance had plenty of room to continue to slowly back up because there was no wall or boundary threatening to trap him in the parking lot. Once Howard came within a distance of approximately one-and-a-half parking spots, Officer Vance opened fire, shooting Howard three times in rapid succession. Howard fell to the ground, wounded, but did not die from his gunshot wounds. Officer Vance secured the scene, and Howard was disarmed and arrested by other officers who arrived on the scene a few minutes later. Howard required an extended period of hospitalization to recover from his injuries.

On April 21, 2022, Howard commenced this suit against Officer Vance and DeKalb County. Howard claimed that Officer Vance used excessive force in violation of the Fourth Amendment

of the U.S. Constitution, and committed battery against Howard under Georgia law when he shot him. Howard also sought to hold DeKalb County liable under a theory that the County's "use of force, de-escalation, and mental illness training" caused Officer Vance to violate Howard's Fourth Amendment rights. The Defendants filed a motion for judgment on the pleadings seeking to dismiss Howard's claims on the ground that Officer Vance's use of force against Howard was justified, and therefore did not violate Howard's constitutional rights. The district court granted the Defendants' motion in its entirety.

Howard now appeals only the district court's dismissal of his claim against DeKalb County.

## II.

We review a district court's decision to grant a motion for judgment on the pleadings for failure to state a claim *de novo*. *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014). "Judgment on the pleadings is appropriate where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law." *Id.* (quotations omitted). In our review, we accept as true all material facts alleged in the non-moving party's pleading, and we view those facts in the light most favorable to the non-moving party, just as we do when we review a ruling on a motion to dismiss. *Id.* So, while we construe all ambiguities in video footage "in favor of the plaintiff, as [we] must, at this stage, construe all ambiguities in the written pleadings in the plaintiff's favor," "we accept the video's depiction instead of the complaint's account and view

23-11035                Opinion of the Court                7

the facts in the light depicted by the video . . . where [the] video[s] [are] clear and obviously contradict[] the plaintiff's alleged facts." *Baker*, 67 F.4th at 1277–78 (citation omitted).

### III.

"[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). To state a so-called "*Monell*" claim against a county under § 1983, a plaintiff must show: "(1) that his constitutional rights were violated; (2) that the [county] had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). Thus, if a plaintiff fails to successfully allege an underlying constitutional violation by an agent of the county, the plaintiff's claim against the county fails as well. *See Baker*, 67 F.4th at 1282 ("[B]ecause there was no underlying constitutional violation, Baker's municipality liability claim against the city fails as a matter of law.").

Here, the underlying constitutional violation alleged by Howard is the use of excessive force by Officer Vance. "Any claim that a law enforcement officer used excessive force -- whether deadly or not -- during a seizure of a free citizen must be analyzed under the Fourth Amendment's 'reasonableness' standard." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009). This

standard requires "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Scott v. Harris*, 550 U.S. 372, 383 (2007) (quotations omitted). "The government's interests include protecting the safety of the police officers involved as well as the public at large." *Garczynksi*, 573 F.3d at 1166.

We analyze the particular facts of each case to determine whether the force used was "objectively reasonable" under the totality of the circumstances. *See Graham v. Connor*, 490 U.S. 386, 396–97 (1989). We consider an officer's conduct "from the perspective of a reasonable officer on the scene, . . . taking into account all of the attendant circumstances." *Kesinger v. Herrington*, 381 F.3d 1243, 1249 (11th Cir. 2004). These circumstances may include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The circumstances often may be "tense, uncertain and rapidly evolving, thereby requiring split-second judgments as to how much force is necessary." *Garczynski*, 573 F.3d at 1167 (quotations omitted). "Because an officer's perspective in the field differs from that of a judge sitting peacefully in chambers, we must resist the temptation to judge an officer's actions with the 20/20 vision of hindsight." *Id.* (quotations omitted).

"[W]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer

or to others, use of deadly force does not violate the Constitution." *Penley v. Eslinger*, 605 F.3d 843, 851 (11th Cir. 2010) (quotations omitted); *see also Cantu v. City of Dothan*, 974 F.3d 1217, 1230 (11th Cir. 2020) (use of deadly force is reasonable if the officer "had probable cause to believe at the time [of the shooting] that [there was] a threat of serious physical harm or death to [him]" or fellow officers); *Hunter v. Leeds*, 941 F.3d 1265, 1279 (11th Cir. 2019) ("It is axiomatic that when an officer is threatened with deadly force, he may respond with deadly force to protect himself."). And in cases where a suspect has a deadly weapon "available for ready use," we have held that an officer is not "required to wait and hope for the best" before resorting to deadly force. *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (alterations omitted) ("[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." (quoting *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007))).

In *United States v. Shaw*, for example, an officer shot a 74-year-old mentally ill man who was advancing on the officer while holding a hatchet, despite repeated commands to stop. 884 F.3d 1093, 1096–98 (11th Cir. 2018). The suspect had not committed a crime, was not attempting to escape, was not aggressively resisting arrest. *Id.* at 1096–98, 1100. Initially walking slowly away from officers in the direction of a nearby restaurant, the suspect ignored repeated commands from officers to put the hatchet down. *Id.* The suspect then turned around, started "moving slowly" toward officers, and repeatedly yelled, "Shoot it!" *Id.* When he was "less than five feet away," the officer opened fire. *Id.* Under the totality

of the circumstances, we held that a reasonable officer could have believed that the suspect posed a serious threat, and that the law "did not require him to wait until the hatchet was being swung toward him before firing in self-defense." *Id.* at 1100. It didn't matter "[w]hether the hatchet was at [the suspect's] side, behind his back, or above his head," because, no matter the exact position, the suspect "could have raised the hatchet in another second or two and struck" the officer with it. *Id.*

Similarly, in *Garczynski*, several officers shot and killed a man who had not committed a crime, was not attempting to escape, and was not aggressively resisting arrest. 573 F.3d at 1161–64. The suspect, who was believed to be armed and suicidal, was sitting in the front seat of his car when the police located him, and then, after ignoring the officers' commands, the suspect pointed his gun at his own temple. *Id.* When the man brought the gun from his own temple and swung it in the direction of the officers, the officers began shooting. *Id.* at 1167–68. We held that the officers' use of deadly force to protect themselves and other officers did not violate the Fourth Amendment in those circumstances. *Id.* at 1168.

Here, Howard has not plausibly alleged that Officer Vance violated his Fourth Amendment right to be free from excessive force. Even accepting the factual allegations as true and viewing the two sources of video footage in Howard's favor, we are bound by precedent to conclude that Officer Vance's use of deadly force was reasonable. Vance responded to a call of an individual behaving erratically, or, in the words of the complaint, having a "mental

health episode." When Vance encountered Howard, he continued to act erratically and refused repeated commands to show his hands. When Howard finally removed his right hand from his pocket, he quickly moved it behind his back to hide whatever he was holding from Officer Vance; dropped his pants while asking Vance if he "want[ed] to see?"; and revealed that his right hand was holding a knife. Howard initially raised the knife to eye level, in what could reasonably be construed as a threatening manner, with the point facing Vance, and started moving toward the officer. Once Howard pulled out the knife, it is clear that Officer Vance had probable cause to arrest him for aggravated assault on a police officer, a felony under Georgia law. *See* O.C.G.A. § 16-5-21(c).

Howard then proceeded to advance toward Officer Vance. Initially hampered by his pants around his ankles, Howard paused to fully remove them before continuing toward Vance, now unimpeded. At the time Officer Vance discharged his weapon, Howard was closing the gap between them, knife still in hand, and had managed to get within one-and-a-half parking spaces of Officer Vance. All the while, and like the suspect in *Shaw*, Howard ignored eight commands by Officer Vance -- all some variation of "put the knife down," with the officer's voice sounding more urgent each time -- and even told Vance several times that he wouldn't "put shit down," in a threatening tone. *See Shaw*, 884 F.3d at 1099.

Thus, at the moment Officer Vance used deadly force to subdue Howard, he was confronted with a suspect who had already exhibited erratic and unpredictable behavior; who was non-

compliant; and who was armed with a knife, *i.e.*, a deadly weapon. Because of his proximity to the officer, Howard -- again like the suspect in *Shaw* -- could have "raised the [knife] in another second or two and struck [Officer Vance] with it," or he even could have thrown the knife at Vance. *Id.* In light of these circumstances, and under our precedent, a reasonable officer in Vance's position could have concluded that Howard posed a serious threat of physical harm to himself or other members of the public in the QuikTrip parking lot. Indeed, footage from Officer Vance's body camera reveals that, just moments after the shooting, the officer had to warn nearby citizens not to get out of their cars, because Howard was still holding the knife while on the ground.

Howard claims that Officer Vance's response violated his Fourth Amendment rights because other alternatives to using deadly force existed -- like using his taser to incapacitate him or continuing to back away from Howard "until additional units arrived or to buy himself time to formulate a cogent plan." It's worth noting, however, that Officer Vance made *multiple* efforts to avoid having to discharge his weapon. As we've detailed, both before and after Howard had removed his pants, Vance repeatedly backed up as Howard approached him knife in hand, and repeatedly asked Howard to put the knife down and to stop advancing on the officer.

In any event, "[t]here is no precedent in this Circuit [] which says that the Constitution requires law enforcement officers to use all feasible alternatives to avoid a situation where deadly force can justifiably be used." *Davis v. Waller*, 44 F.4th 1305, 1316 (11th Cir.

2022) (quoting *Menuel v. City of Atlanta*, 25 F.3d 990, 996 (11th Cir. 1994)). "There are, however, cases which support the assertion that, where deadly force is otherwise justified under the Constitution, there is no constitutional duty to use non-deadly alternatives first." *Id.* (quoting *Menuel*, 25 F.3d at 996).

As we've explained, Officer Vance's use of deadly force was justified because, under the totality of the circumstances, a reasonable officer in his position could have concluded that Howard presented an immediate threat of serious physical harm. So, whether Officer Vance could have responded differently is immaterial because that does not meaningfully change the threat of serious physical harm presented by Howard. *See Jean-Baptiste*, 627 F.3d at 821 (holding that officer confronted by a suspect armed with a deadly weapon was not "required to wait and hope for the best" before employing deadly force (cleaned up)); *Davis*, 44 F.4th at 1316 (rejecting plaintiff's argument that use of deadly force against an armed suspect driving a large truck was unreasonable, even though alternatives like shooting out the tires or waiting for the truck to reach an area where other officers could assist were available).[2]

---

[2] None of the cases Howard cites are relevant. In *Mercado v. City of Orlando*, for instance, we held that a jury could conclude that an officer's use of deadly force against an individual threatening to commit suicide by plunging a knife into his own chest was unreasonable where the individual was sitting on the floor, six feet away from the officers, and "had not made any threatening moves toward himself or the officers." 407 F.3d 1152, 1158, 1160–61 (11th Cir. 2005). Nor, notably, did *Mercado* hold that the Fourth Amendment *requires* officers to consider alternatives to deadly force when faced with an immediate threat of *deadly harm*. *See id.* Nor did we so hold in our unpublished,

Howard also argues that this case is distinguishable from *Shaw* on procedural and factual grounds.  As for his claim that *Shaw* is irrelevant since it addressed the second prong of the qualified immunity analysis -- the "clearly established law ground" -- we made a clear finding in it that "a reasonable officer could have believed that Shaw posed a threat of serious physical injury or death" because Shaw was advancing on the officer with a hatchet in hand, which goes to the existence of a constitutional violation in first part of the qualified immunity analysis.  *See* 884 F.3d at 1100.  As for his observation that *Shaw* was decided at the summary judgment stage, no material factual disputes need to be resolved in this case, so any distinction based on the availability of discovery makes no difference here.  And, lastly, Howard says that *Shaw* is factually distinct because the suspect there was threatening others before the officers arrived; the distance between the suspect and the officer at the time of the shooting was "less than five feet"; the suspect was approaching the officer with a hatchet, rather than a knife; and the officer did not have readily available alternatives to the use of deadly force.  But even assuming these distinctions exist, none of them warrants a different result in this case, since, under this set of

---

nonbinding decision in *Teel v. Lozada*, 826 F. App'x 880 (11th Cir. 2020).  Further, none of the nonbinding, out-of-circuit authority he cites suggests that Officer Vance was required to do so.  *See Glenn v. Washington Cnty.*, 673 F.3d 864 (9th Cir. 2011); *Retz v. Seaton*, 741 F.3d 913 (8th Cir. 2014); *Carpenter v. City of Bean Station*, No. 2:09-CV-140, 2011 WL 5025883 (E.D. Tenn. Oct. 21, 2011), *R. &R. aff'd* No. 2:09-CV-140, 2012 WL 481830 (E.D. Tenn. Feb. 14, 2012).

facts, Officer Vance reasonably believed he was under the immediate threat of deadly force when he shot Howard.

In short, Officer Vance did not use excessive force or violate the Fourth Amendment when he shot Howard.  And without an underlying constitutional violation, Howard cannot impose liability on the County under § 1983.[3]  *See McDowell*, 392 F.3d at 1289. Accordingly, the district court did not err in granting the County's motion for judgment on the pleadings and we affirm the dismissal of Howard's *Monell* claim against the County.

**AFFIRMED.**

---

[3] We therefore need not address Howard's argument that the County's "use of force, de-escalation, and mental illness training" caused Officer Vance to deprive him of his Fourth Amendment rights by shooting him.