[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-13942

_____

MARY FOULKE,
As Personal Representative for
the Estate of John C Young,

JACK YOUNG, JR.,

As Personal Representative for
the Estate of John C Young,

Plaintiffs-Appellants,

*versus*

DANIEL WELLER,
JOSHUA LAVOIE,
LUKE MCCRACKEN,
JAMES BARNES,
JACOB HOLLOWAY, et al.,

2                    Opinion of the Court                    22-13942

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 3:20-cv-05506-MCR-ZCB

_____

Before WILSON, GRANT, and LAGOA, Circuit Judges.

PER CURIAM:

On December 1, 2018, John Young[1] called 911 and confessed to a murder that—we now know—never happened. Young told the dispatcher that he had killed a man with a meat cleaver and intended to kill the responding officer and perhaps himself, too. When officers arrived at his apartment, Young answered the door holding his meat cleaver and another knife. Young rebuffed the officers' repeated orders to drop his weapons, even after he was shot with multiple non-lethal beanbag rounds. Fearing for their safety, the officers eventually opened fire, killing Young.

This appeal arises from the Appellants' suit under 42 U.S.C. § 1983 that followed. We recognize that this case involves a difficult set of facts. But after careful review, and with the benefit of

_____

[1] The Appellants in this appeal are Mary A. Foulke and Jack Young, Jr., as personal representatives of the Estate of John C. Young. Unless otherwise indicated, "Young" refers to the decedent, John Young.

oral argument, we affirm the district court's order granting summary judgment in favor of the Appellees on all of the Appellants' claims.

## I.     BACKGROUND

### A.     Factual Background[2]

The relevant facts begin with John Young's phone call to 911. Young first spoke to an Escambia County dispatcher. The dispatcher asked if Young needed police or ambulance assistance, and Young responded, "Well, I just murdered someone." After taking Young's name and contact information, the dispatcher asked Young to describe exactly what happened. Young stated plainly, "Well, I murdered someone, and I'm thinking about killing myself or killing someone else, too." At that point, the Escambia dispatcher

---

[2] "[F]or summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the [non-movant]." *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002). We accept these facts for summary-judgment purposes only. *Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion may not be the actual facts." (alteration adopted) (quoting *Swint v. City of Wadley*, 5 F.3d 1435, 1439 (11th Cir. 1993))). We may also consider facts from the record evidence that the parties did not cite in their briefing before the district court. Fed. R. Civ. P. 56(c)(3) (explaining that, while we "need consider only the cited materials," we "may consider other materials in the record"); *see also Tippens v. Celotex Corp.*, 805 F.2d 949, 952 (11th Cir. 1986) ("The District Court shall consider all evidence in the record when reviewing a motion for summary judgment . . . and can only grant summary judgment 'if *everything* in the record . . . demonstrates that no genuine issue of material fact exists.'" (quoting *Keiser v. Coliseum Props., Inc.*, 614 F.2d 406, 410 (5th Cir. 1980)).

transferred Young to the Escambia County Sheriff's Office ("ECSO").

An ECSO dispatcher came on the line and asked Young about his emergency. Young again said, "Well, I just murdered someone. . . . I just murdered a man." The Sheriff's Office dispatcher took down the address Young provided and asked Young if the person he murdered was in the apartment with him. Young confirmed that he was. The dispatcher asked, "How did you do this, sir, what kind of weapon?," to which Young responded, "With a meat cleaver." The dispatcher called for emergency medical services to head to the apartment and then pressed Young for more details, asking whether "this just happen[ed], or did this happen a long time ago, or did it happen tonight?" Young told him that "[i]t just happened" and that he did not know who his victim was. Young also told the dispatcher that the dead man had not tried to break into his home, but that "I'm just suicidal right now. . . . I just wanted to kill myself, and killed somebody else." The dispatcher asked if Young still had the meat cleaver and told him he would need to put the meat cleaver down when the officers arrived. Young objected, saying, "No, because I'm going to kill one of them, too." The dispatcher asked, "You're gonna what?," and Young repeated, "I'm gonna kill one of them, too." Young then told the dispatcher, "I have a gun, also." The dispatcher asked for more details, including where the body was in the apartment and what race the victim was. The dispatcher then told Young that the police

22-13942                Opinion of the Court                5

were on the way, and the call ended.  The entire phone conversation lasted about four minutes.

Deputies Augustus Fetterhoff, Joshua Lavoie, Daniel Weller, Andrew Nichols, and Luke McCracken, and Sergeants Jacob Holloway and Melissa Scruggs, arrived on the scene at 3:55 a.m.[3]  Sergeant Holloway was the patrol sergeant on shift, and although he was not the highest-ranking officer on scene, he was trained in crisis intervention and was making the tactical decisions.  He heard over the radio that he and his deputies needed to respond to "a welfare check at the Alabaster Gardens . . . where a subject had called into dispatch saying that he had just murdered someone with a meat cleaver, and that he was . . . also armed with . . . a firearm."  Due to "the severity of the call," Sergeant Holloway wanted to ensure he responded with "plenty of officers . . . to deal with the call safely."  Of the various scenarios running through his head, Holloway said that "one of the possibilities" was that the caller could have been experiencing a mental health crisis.  At the same time, the officers knew they were responding to a call from a man who was *not only* having suicidal thoughts, but who had *also* admitted to a murder and claimed he was heavily armed and inclined to kill again.

---

[3] According to the Appellees, Deputies Leite and Freauff, who are not parties to this appeal, also initially arrived at the scene.  In opposing the Appellees' summary judgment motion, the Appellants noted that those two deputies were never identified or interviewed.  Whether Deputies Leite and Freauff were present at the scene, however, is not relevant to the resolution of this appeal.

The officers tried to call Young on the phone to start a dialogue, but Young did not answer. Sergeant Holloway then approached Young's apartment and knocked on the door. Deputy Weller stood to Sergeant Holloway's left, with Deputies Lavoie and McCracken behind them. Deputy Weller was armed with a bean-bag shotgun, Deputy Lavoie was armed with an AR-15, and Deputy McCracken was armed with his taser. Deputy Fetterhoff was "fourth in the stack" behind Deputies Weller, Lavoie, and McCracken, and he kept his weapon holstered. Sergeant Scruggs stood at a landing several feet back, in a position where she could still see the door. Lieutenant James Barnes, who had also arrived at the scene, stood ten or fifteen feet behind the other officers, further down the breezeway. Deputy Nichols was still further back and could not see the doorway.

After Sergeant Holloway knocked, Young opened the door armed with a meat cleaver in one hand and a box cutter in the other. Several officers immediately issued commands, ordering Young to drop the weapons and show his hands. The officers recall some instructions differently. For example, Deputy McCracken testified that Sergeant Holloway told Young to "put the weapons down, um, come out here and talk to us." Sergeant Holloway, on the other hand, recalls telling Young that he did not have to come out and should stay in the apartment and just talk to the officers. "[Y]ou don't have to do it this way, man," Holloway said. But

22-13942                Opinion of the Court                7

Young replied, "yes, I do" and stepped out of the apartment.[4] As Young crossed the apartment door's threshold toward the officers, he was still armed with the box cutter and meat cleaver.

[4] The Appellants, in their summary judgment briefing, tried and failed to demonstrate a genuine dispute of material fact as to whether Young "advanced" out of the apartment. They offered several contradictory theories of what happened. First, they stated that "Mr. Young's position outside of the threshold of his apartment door was invited by the Defendants and was not a threatening advancement." But in conceding that Young—who was initially inside the apartment—eventually took a "position outside the threshold," the Appellants have admitted that Young, at some point, moved to outside of his apartment. As to the "invitation" to come outside, the Appellants point to Deputies McCracken's and Weller's testimonies, but their reliance on their testimonies is misplaced. Starting with Deputy McCracken, he did testify that Sergeant Holloway told Young to come out of the apartment, but that is not the *whole* statement to which Deputy McCracken testified. Rather, he testified, "Whenever I first got up there, um, Holloway is already making contact with him. He's in the doorway. And, you know, Holloway is saying, hey, sheriff's office. *Please put the weapons down, um, come out here and talk to us*, you know, we're not gonna hurt you, you know." (Emphasis added). Likewise, Deputy Weller testified that he heard Sergeant Holloway "encouraging [Young] to come out and talk with us" *and* that deputies, including Deputy Weller himself, told Young to drop the weapons. In other words, while the officers did invite Young to come out and talk, they invited him to do so *unarmed*.

Second, the Appellants dispute the direction Young was facing as he moved towards the officers. They concede that Sergeant Holloway and Deputy McCracken both testified that Young "stepped out into the hallway," but they insist that, because Young was "sideways to the Defendants," he was not "advancing." But the Appellants cite no case in support of the proposition that one cannot "advance" while facing sideways. Taking the facts in the light most favorable to the Appellants—but only to the extent that those facts are supported by the record evidence—we conclude that the officers did instruct

What happened next is hotly disputed by the parties. The officers assert that Young raised the meat cleaver up to about chest-level and then threw it at them. The Appellants, on the other hand, offer an expert report that questions whether Young would have been capable of raising his arm in that manner, citing Young's various preexisting medical conditions. Because of the tragic outcome in this case, Young was not able to testify to his recollection of the events. As this Court has observed, we do not want to "reward an officer for unlawfully engaging in actions that rendered the arrestee unable to rebut the officer's version of events." *Hinson v. Bias*, 927 F.3d 1103, 1118 (11th Cir. 2019). To that end, "we must 'carefully examine all the evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other known facts.'" *Id.* (quoting *Flythe v. District of Columbia*, 791 F.3d 13, 19 (D.C. Cir. 2015)). For that reason, out of an abundance of caution and taking all inferences in favor of the non-moving parties, we will presume that Young did not raise or throw the cleaver, but rather, continued to hold it down at his side.

Deputy Weller—armed with the non-lethal bean-bag gun— then told Young, "drop it or I'll shoot you." Young did not comply, so Deputy Weller shot him in the ribcage with the beanbag. The beanbag rounds had little effect on Young though, even as Weller fired four more. Young continued to stand with the meat cleaver in hand, ignoring the officers' commands to drop the weapons.

---

Young to come out *and* drop his weapons, but instead, Young came out— "advanced"—with his weapons in hand.

Then, McCracken tased Young, but that was also ineffective in making Young comply. Facing what he perceived as an immediate threat that "either Deputy Weller or I were gonna get hit with that meat cleaver," Sergeant Holloway opened fire with his service weapon, as did Deputies McCracken, Weller, and Lavoie.

The entire encounter—from the time the officers arrived at the apartment complex until the shooting ceased—lasted less than three minutes. After the ceasefire, one of the officers handcuffed Young; Deputy McCracken and another deputy began CPR; and Deputy Weller, Deputy Fetterhoff, and Sergeant Holloway checked the inside of the apartment for both dangers and the potential dead body Young had originally called about—which, as we now know, did not exist. The officers roped off the area with crime scene tape, and Lieutenant Barnes contacted the Florida Department of Law Enforcement ("FDLE"), the Investigations division of ECSO, and the Florida State Attorney's Office. Ten minutes after the shots were fired, the ECSO crime scene team arrived to photograph and preserve the scene. Once FDLE arrived, the investigation was handed over to them pursuant to an "Officer Involved Shooting Memorandum of Understanding" between FDLE and ECSO.

Special Agent Mark Zagar, the FDLE case agent, directed the processing and collection efforts on the scene. An FDLE crime analyst, Jennifer Wilkerson, collected the officers' weapons and photographed the officers, Deputy Weller's pants, and Deputy Weller's cell phone case. Based on each gun's maximum capacity and the number of rounds left in each one upon collection, Sergeant

Holloway fired 12 shots, Deputy McCracken fired 2 shots, Deputy Weller fired 9 shots, and Deputy Lavoie fired 2 shots.

### B.    Procedural History

On June 1, 2020, the Appellants, as personal representatives of Young's estate, filed a complaint in the district court against the Appellees.  The Appellants then filed an amended complaint asserting the claims below: a § 1983 *Monell*[5] claim against Sheriff Chip Simmons[6] for failure to implement proper use-of-force policies (Count I); conspiracy to fabricate evidence against all defendants (Count II); excessive force claims under § 1983 against Sergeant Holloway and Deputies Weller, McCracken, and Lavoie (Counts III to VI); a failure-to-intervene claim against Lieutenant Barnes (Count VII); claims under Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("RA") against Sheriff Simmons in his official capacity as Sheriff of Escambia County (Counts VIII and IX); Florida wrongful death claims against Sheriff Simmons under separate theories of direct liability in his official capacity and respondeat superior (Count X and XI); and Florida wrongful death claims against Lieutenant Barnes, Sergeant Holloway, and Deputies Weller, McCracken, and Lavoie (Counts XII–XVI).  The district court dismissed the conspiracy

---

[5] *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

[6] When the Appellants first filed their complaint, the Sheriff of Escambia County was David Morgan.  Pursuant to Federal Rule of Civil Procedure 25(d), Morgan was later replaced with Chip Simmons when Simmons took over as sheriff.

claim and the wrongful death claim against Lieutenant Barnes, and allowed the rest of the Appellants' claims to proceed. The Appellees filed their answers and affirmative defenses.

A year into the litigation, the Appellants moved for sanctions, claiming the officers had spoliated evidence—Deputy Weller's pants and cell phone case—by failing to preserve them immediately after the incident. The district court denied that motion, reasoning that the Appellees had been careless but had not acted in bad faith and that the evidence was not crucial to the Appellants' case in chief.

After the close of discovery, the Appellees moved for summary judgment, which the Appellants opposed. The district court issued an order granting summary judgment in favor of the Appellees on all of Appellants' claims and entered final judgment. First, as to the § 1983 claims, the district court concluded that the deputies were entitled to qualified immunity and that the *Monell* claim against Sheriff Simmons and the failure-to-intervene claim against Barnes failed as a matter of law because the deputies did not use excessive force. Second, as to the ADA and the RA claims, the district court found that there was insufficient evidence for a reasonable jury to conclude that Young had a qualifying mental disability and that the officers intentionally discriminated against Young's alleged mental disability. And third, as to the state law claims, the court explained that the officers' use of force was objectively reasonable, meaning that the claims failed as a matter of law.

This timely appeal followed.

## II.    STANDARDS OF REVIEW

We review the district court's grant of summary judgment *de novo*, "viewing all evidence and any reasonable inferences that might be drawn therefrom in the light most favorable to the non-moving party." *McCullough v. United States*, 607 F.3d 1355, 1358 (11th Cir. 2010) (quoting *Rine v. Imagitas, Inc.*, 590 F.3d 1215, 1222 (11th Cir. 2009)).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine dispute requires more than 'some metaphysical doubt as to the material facts,'" and "[a] 'mere scintilla' of evidence is insufficient; the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) (first quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007); then quoting *Kesinger v. Herrington*, 381 F.3d 1243, 1249–50 (11th Cir. 2004)).

"[S]ummary judgment is appropriate even if '*some* alleged factual dispute' between the parties remains, so long as there is 'no *genuine* issue of *material* fact.'"  *Id.* (quoting *Scott*, 550 U.S at 380).  Genuine disputes of fact are "those in which the evidence is such that a reasonable jury could return a verdict for the non-movant." *Hairston v. Gainesville Sun Publ'g Co.,* 9 F.3d 913, 919 (11th Cir. 1993).  To be considered genuine, factual issues "must have a real basis in the record."  *Id.*  And an issue of fact is material if, "under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004).  Further, we may "affirm the district court's judgment on

any ground that appears in the record, whether or not that ground was relied upon or even considered by the court below." *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1275 (11th Cir. 2012) (quoting *Harris v. United Auto. Ins. Grp., Inc.*, 579 F.3d 1227, 1232 (11th Cir. 2009)).

We review the district court's decision about spoliation sanctions for an abuse of discretion. *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 943 (11th Cir. 2005). The district court is "accorded wide discretion in ruling upon discovery motions, and appellate review is accordingly deferential." *Harris v. Chapman*, 97 F.3d 499, 506 (11th Cir. 1996); *accord ML Healthcare Servs., LLC v. Publix Super Mkts., Inc.*, 881 F.3d 1293, 1297 (11th Cir. 2018).

### III.    ANALYSIS

On appeal, the Appellants raise three issues. First, they argue that there are genuine disputes of material fact precluding the grant of summary judgment on qualified immunity for their excessive force claims and their failure to intervene, supervisory liability, and wrongful death claims arising from the same nucleus of facts. Second, the Appellants argue that there are genuine disputes of material fact precluding the grant of summary judgment on their ADA and RA claims. Third, the Appellants contend that the district court abused its discretion in finding that the Appellees did not act in bad faith when spoliating physical evidence that they argue was

crucial to proving the Appellees' entitlement to qualified immunity. We address these arguments in turn.

### A.    Qualified Immunity

The Appellants contend that the district court erred in granting summary judgment based on qualified immunity as to their § 1983 claims and their related claims for failure to intervene, supervisory liability, and wrongful death. The Appellants argue that genuine disputes of material fact should have precluded the grant of summary judgment on the following issues: whether the officers reasonably believed Young was committing a crime, whether Young posed an immediate threat to the officers or others, whether Young was acting in a way that could be perceived as an attempt to evade arrest, and whether differing inferences could be drawn from the undisputed facts, so as to undermine any justification for the use of deadly force.

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). By imposing liability only for violations of clearly established law, the defense of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and

liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

In order to receive qualified immunity, an officer "must first prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)). "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Id.* "To overcome a qualified immunity defense, the plaintiff must make two showings." *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019). "First, the plaintiff must establish that the defendant violated a constitutional right." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1199 (11th Cir. 2007). Second, "the plaintiff must show that the violation was clearly established." *Id.* Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Corbitt*, 929 F.3d at 1311 (quoting *Pearson*, 555 U.S. at 236).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Vinyard*, 311 F.3d at 1350 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)) (emphasis omitted). The defendant must have fair notice of his conduct's unconstitutionality, derived from one of the following sources: (1) "obvious clarity"; (2) broad holdings or

statements of principle in case law that are not tied to particularized facts; or (3) fact-specific judicial precedents that are not readily distinguishable. *Id.* at 1350–51. "The critical inquiry is whether the law provided [the officer] with 'fair warning' that his conduct violated the [the plaintiff's rights]." *McClish v. Nugent*, 483 F.3d 1231, 1248 (11th Cir. 2007) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). In this Circuit, only the "decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state (here, the Supreme Court of Florida) can clearly establish the law." *Id.* at 1237.

"[I]n the end[,] we must still slosh our way through the fact-bound morass of 'reasonableness.'" *Scott*, 550 U.S. at 383. "[A]t the summary judgment stage," however, "once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record*, the reasonableness of the officer's actions . . . is a pure question of law." *Penley v. Eslinger*, 605 F.3d 843, 848–49 (11th Cir. 2010) (alteration adopted) (quoting *Scott*, 550 U.S. at 381 n.8).

We begin with discretionary authority. The Appellants alleged that Sergeant Holloway, Lieutenant Barnes, and Deputies Weller, McCracken, and Lavoie were acting within the course and scope of their employment at all material times. Indeed, the undisputed evidence shows that the Appellees were acting within the course and scope of their employment. The burden therefore shifts

to the Appellants to show that the officers are not entitled to qualified immunity.  *See Lee*, 284 F.3d at 1194.

Next, we ask whether the facts, when viewed in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right.  *Vinyard*, 311 F.3d at 1346 & n.8.  While we recognize that the facts presented are tragic, the answer here is "no."

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest."  *Lee*, 284 F.3d at 1197.  To determine whether the force the officers used was excessive, a court must determine "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Graham v. Connor*, 490 U.S. 386, 397 (1989).  This inquiry "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'"  *Lee*, 284 F.3d at 1197 (quoting *Graham*, 490 U.S. at 396).  In assessing the "reasonableness" of the force the officers deployed, we look to "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396.

Generally, "we are loath to second-guess the decisions made by police officers in the field," given that "police officers are often

forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Penley*, 605 F.3d at 854 (alteration adopted) (first quoting *Vaughan v. Cox*, 343 F.3d 1323, 1331 (11th Cir. 2003); then quoting *Graham*, 490 U.S. at 397). Thus, "[i]n deciding whether the force deliberately used is, constitutionally speaking, 'excessive,'" we use an objective measure of reasonableness, i.e., we "must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015); *accord Powell v. Snook*, 25 F.4th 912, 921 (11th Cir. 2022) ("We view the facts 'from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts,' and we 'balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate.'" (quoting *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009))), *cert. denied*, 143 S. Ct. 110 (2022); *Tillis ex rel. Wuenschel v. Brown*, 12 F.4th 1291, 1298 (11th Cir. 2021) ("Although we construe the facts in the light most favorable to the plaintiffs, we determine reasonableness from the perspective of 'a reasonable officer on the scene at the time the events unfolded.'" (citation omitted) (quoting *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010))).

At first blush, this appears to be the type of case that "do[es] not fit neatly within the *Graham* framework" because "this situation does not involve a criminal arrest." *Mercado v. City of Orlando*, 407 F.3d 1152, 1157 (11th Cir. 2005). After all, Florida does not

recognize attempted suicide as a crime, *see Krischer v. McIver*, 697 So.2d 97, 100 (Fla. 1997), so that cannot be the basis of our "severity of the crime" analysis under *Graham*. But we "must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley*, 576 U.S. at 397. And it is only through hindsight that we know Young was suffering from mental illness and had not, in fact, committed any crime before calling 911. That hindsight knowledge is irrelevant because our analysis is limited to what the officers knew at the moment they encountered Young. *Crosby v. Monroe County*, 394 F.3d 1328, 1333–34 (11th Cir. 2004) ("In making an excessive force inquiry, . . . [w]e must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction could prove fatal.").

In this case, it is undisputed that when the officers responded to Young's call, they knew that Young claimed to have committed a violent felony—a murder with a meat cleaver—and was potentially also armed with a firearm. The officers therefore had good reason to believe that Young was armed and dangerous when they arrived at his home, and we do not accept the Appellants' framing of the facts as a purely suicide-based case, akin to either *Mercado* or *Teel v. Lozada*, 826 F. App'x 880 (11th Cir. 2020). It is true that Sergeant Holloway also suspected that Young was experiencing a mental health crisis, but we find no support—nor have the Appellants identified any—for the proposition that the coexistent

possibility of a mental health crisis requires officers to ignore clear and present threats of danger to their own safety when responding to a reported violent crime.

We have held that "a police officer may use deadly force to dispel a threat of serious physical harm to either the officer or others, or to prevent the escape of a suspect who threatens this harm." *Davis v. Waller*, 44 F.4th 1305, 1313 (11th Cir. 2022) (alterations adopted) (quoting *Singletary v. Vargas*, 804 F.3d 1174, 1181 (11th Cir. 2015)). Additionally, "it is reasonable, and therefore constitutionally permissible, for an officer to use deadly force when he has 'probable cause to believe that his own life is in peril.'" *Id.* (quoting *Singletary*, 804 F.3d at 1181). Indeed, when a suspect has a weapon "available for ready use," law enforcement is "not required to wait and hope for the best." *Jean-Baptiste*, 627 F.3d at 821 (alteration adopted) (quoting *Scott*, 550 U.S. at 385).

Again, the facts below are undisputed: Young answered the apartment door with a meat cleaver in one hand and a box cutter in the other. The officers gave him repeated orders to drop the weapons. And though the Appellants take issue with whether Young "advanced" toward the officers, Young did, at some point, emerge from his apartment with his weapons still in hand. The officers tried not only one, but two means of non-lethal force, but both were ineffective to gain his compliance.[7] Because "the law

---

[7] At oral argument, counsel for the Appellants discussed whether the officers struck Young with non-lethal "beanbag" rounds before they deployed lethal force because, if they had, there would be "significant damage" to Young's

does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect," the officers were not required to wait for Young to throw the cleaver or stab an officer before they forcibly disarmed him. *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007); *see also City of Tahlequah v. Bond*, 595 U.S. 9, 11 (2021) (concluding that officers were entitled to qualified immunity when a suspect, more than six feet away from the officers, picked up a hammer and held it at shoulder level as if to swing it at them). Moreover, an officer "is entitled to continue his use of force until a suspect thought to be armed is 'fully secured'" and is not "required to interrupt a volley of bullets until he [knows] that [the suspect] ha[s] been disarmed." *Jean-Baptiste*, 627 F.3d at 821–22. In other words, the officers here were not required to shoot once, wait for the meat cleaver to fall (or not), and then reassess their next shot. As we said in *Jean-Baptiste*, until an officer verifies that a suspect was disarmed, the officer has "no reason to trust that [the suspect] would not suddenly attempt to do him harm." *Id*. at 822 (quoting *Crenshaw v. Lister*, 556 F.3d 1283, 1293 (11th Cir. 2010)).

Returning to the *Graham* factors, all three of them favor the Appellees. As to "the severity of the crime at issue," Young claimed to have murdered someone and threatened to murder the officers.

---

body. Counsel further argued that there is no evidence in the record to show that the beanbags hit his body. However, a review of the autopsy photos and report reveal multiple contusions on Young's body consistent with beanbag impact. In any event, this argument was not raised below.

*See Graham*, 490 U.S. at 396. As to "whether the suspect pose[d] an immediate threat to the safety of the officers or others," Young brandished two weapons, one in each hand. *See id.*; *Shaw v. City of Selma*, 884 F.3d 1093, 1100 (11th Cir. 2018) ("On this occasion[,] Shaw presented a clear danger. He was an armed and noncompliant suspect who had ignored more than two dozen orders to drop the hatchet."). Finally, Young's refusal to comply with repeated orders to drop his weapons amounts to "actively resisting arrest." *See Graham*, 490 U.S. at 396; *Smith v. LePage*, 834 F.3d 1285, 1294–95 (11th Cir. 2016) ("Leading up to the first tasing, Mr. Smith was armed with a knife. He repeatedly disobeyed the officers' commands to drop the weapon and moved toward the officers while holding the weapon. . . . [A] reasonable officer on the scene could have believed that Mr. Smith posed a danger to himself or others and was actively resisting arrest."); *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (noting that there was "a reasonable need for some use of force" where a suspect "repeatedly refused to comply with [the officer's] verbal commands").

For these reasons, we are unpersuaded by the Appellants' argument that Young did not pose a threat to the officers' safety or that, even if he did threaten their safety, the officers continued to use lethal force after that threat was subdued. Young's claim to have committed a murder, his threat to the responding officers, his brandishing of weapons, and his step towards the officers all justified their use of deadly force. And although many shots were fired, the entire volley lasted only three seconds, and the law of this Circuit counsels that an officer need not interrupt his justified force

22-13942                Opinion of the Court                23

until he knows the suspect is "fully secured" and "ha[s] been disarmed." *Jean-Baptiste*, 627 F.3d at 821–22.

On a final note, the Appellants dispute whether Young raised or threw the meat cleaver. We recognize that this is a genuine dispute, but it is not a dispute over a *material* fact. *See Hickson Corp.*, 357 F.3d at 1259 (noting that an issue of fact is material if, "under the applicable substantive law, it might affect the outcome of the case"). Here, whether Young threw the cleaver is not outcome determinative. Even when we take the facts in the light most favorable to the Appellants—i.e., by assuming that Young held the cleaver low and did *not* throw it—the officers' actions were still justified. *Cf. Shaw*, 884 F.3d at 1099 ("Shaw could have raised the hatchet in another second or two and struck Williams with it. Whether the hatchet was at Shaw's side, behind his back, or above his head doesn't change that fact. Given those circumstances, a reasonable officer could have believed that Shaw posed a threat of serious physical injury or death at that moment."). The officers here made split-second judgments in a "tense, uncertain, and rapidly evolving" situation with an unstable, armed man who was ignoring their orders. *See Graham*, 490 U.S. at 397. Thus, the totality of the circumstances provides ample justification for the officers' use of deadly force.

Because we hold that the officers did not violate Young's constitutional rights, we need not reach the question of whether the right was clearly established. *See Cottone v. Jenne*, 326 F.3d 1352, 1362 (11th Cir. 2003), *abrogated in part on other grounds by Randall v.*

*Scott*, 610 F.3d 701 (11th Cir. 2010); c*f. Corbitt*, 929 F.3d at 1323. And because the officers did not use excessive force, the Appellants' § 1983 claim against Lieutenant Barnes necessarily fails because there can be no failure to intervene without a predicate constitutional violation. *Sebastian v. Ortiz*, 918 F.3d 1301, 1312 (11th Cir. 2019) ("Plainly, an officer cannot be liable for failing to stop or intervene when there was no constitutional violation being committed."). Similarly, the supervisory liability claim against the Sheriff fails because "[t]here can be no policy-based liability or supervisory liability when there is no underlying constitutional violation." *Knight ex rel. Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 821 (11th Cir. 2017); *accord City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point." (emphasis omitted)).

Accordingly, we affirm the district court's grant of summary judgment on these claims.

### B.    The State-Law Wrongful Death Claim

We next address the Appellants' state-law wrongful death claim and conclude that it fails because the officers' use of force was objectively reasonable. Under Florida law, "police officers are entitled to a presumption of good faith in regard to the use of force applied during a lawful arrest, and officers are only liable for damage where the force used is 'clearly excessive.'" *Davis v. Williams*, 451 F.3d 759, 768 (11th Cir. 2006) (quoting *City of Miami v. Sanders*,

672 So. 2d 46, 47 (Fla. Dist. Ct. App. 1996)).  And police officers "are provided a complete defense to an excessive use of force claim where an officer 'reasonably believes [the force] to be necessary to defend himself or another from bodily harm while making the arrest.'"  *Sanders*, 672 So. 2d at 47 (alteration in the original) (quoting Fla. Stat. § 776.05(1)(1995)); *accord Johnson v. City of Miami Beach*, 18 F.4th 1267, 1275 (11th Cir. 2021) ("[T]o determine whether the force used was excessive, Florida courts analyze whether the amount of force used was reasonable under the circumstances.").

As we have explained above, the officers' use of force was objectively reasonable here.  Therefore, the district court did not err in granting summary judgment on the Appellant's state law wrongful death claim against the Appellees.  *Penley*, 605 F.3d at 855–56.  Accordingly, we affirm as to this claim.

## C.    The Americans with Disabilities Act and Rehabilitation Act Claims

Next, the Appellants contend that the district court erred in granting summary judgment as to their ADA and RA claims against Sheriff Simmons.  The Appellants asserted two theories of liability below: (1) that Sheriff Simmons is liable for the officers' intentional discrimination against Young on the basis of his mental disability; and (2) that Sheriff Simmons violated the ADA and the RA by failing to enact proper policies that would have prevented Young's death.  The Appellants insist that "there are disputed issues of genuine material fact as to whether the officers could have further

accommodated" Young, precluding the grant of summary judgment on these claims.

Title II of the ADA[8] provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *accord Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1081 (11th Cir. 2007). To establish a Title II claim, a plaintiff must demonstrate:

> (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability.

*Bircoll*, 480 F.3d at 1083. A "disability" is defined as "a physical or mental impairment that substantially limits one or more of the

---

[8] The RA prohibits discrimination on the basis of disability by all programs and activities that receive federal funding. 29 U.S.C. § 794(a). We rely on cases construing the RA and the ADA "interchangeably," as "the same standards govern discrimination claims under both statutes." *T.W. ex rel. Wilson v. Sch. Bd. of Seminole Cnty.*, 610 F.3d 588, 604 (11th Cir. 2010) (quoting *Allmond v. Akal Sec., Inc.*, 558 F.3d 1312, 1316 n.3 (11th Cir. 2009)); *accord Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1133–34 (11th Cir. 2019) ("In other words, whatever we have said—or say now—about Title II goes for § 504, and vice versa."). We therefore discuss the ADA and RA claims together under one standard.

major life activities of such individual," "a record of such impairment," or "being regarded as having such an impairment."    42 U.S.C. § 12102(1)(A)–(C).  The text of the ADA expressly provides that the last prong—"being regarded as having such an impairment"—"shall not apply to impairments that are transitory and minor." § 12102(3)(B); *accord EEOC v. STME, LLC*, 938 F.3d 1305, 1314 (11th Cir. 2019) ("[A]n employee has a 'disability' under the ADA when that employee actually has, or is perceived as having, an impairment that is not transitory and minor.").

A public entity is not vicariously liable for its employees' violations of the ADA.  *See Ingram v. Kubik*, 30 F.4th 1241, 1258 (11th Cir. 2022).  Instead, public entity liability "requires the deliberate indifference of an *official* who at a minimum has *authority* to address the alleged discrimination and to institute corrective measures on the entity's behalf and who has *actual knowledge* of discrimination in the entity's programs and fails adequately to respond."  *Id*. at 1259 (alterations adopted) (quoting *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 349 (11th Cir. 2012)).  Therefore, to assess the Sheriff's liability under the ADA and RA, we must first decide whether the officers violated either of those acts by intentionally discriminating against Young as a disabled individual.  If the officers did violate the ADA or RA, we must then determine whether any of the Appellants are an official with the authority to addresses the alleged discrimination *and* whether that deputy had actual

28                      Opinion of the Court                    22-13942

knowledge of discrimination and, through deliberate indifference, failed to adequately respond.  *See id.*

The first step of our analysis is determining whether Young had a qualifying disability.  This inquiry is dispositive here because our record is devoid of any evidence that would allow a jury to find that he had such a disability.  Although the Appellants state in passing that Young, "a depressive schizophrenic, was a qualified individual with a disability," they point to no evidence in support of that claim.  And the Appellants implicitly concede as much because they say the officers were only "on notice that Mr. Young was, at a minimum, suicidal and suffering from a mental health crisis, acting in a way consistent with an individual with a disability."  But an acute mental health crisis is a "transitory" impairment and thus does not qualify as a disability.  *See* § 12102(3)(B) ("A transitory impairment is an impairment with an actual or expected duration of 6 months or less.").  And the Appellants do not suggest that the Appellees were, or should have been, aware of Young's apparent schizophrenia.  Because there is no evidence of disability in the record, our analysis could end here.[9]

But even if Young's temporary mental health crisis qualified as a disability within the meaning of the ADA, their claims would

---

[9] In support of their view that knowledge of a potential mental health crisis gives rise to liability under the ADA, the Appellants cite *Vos v. City of Newport Beach*, 892 F.3d 1024 (9th Cir. 2018).  In *Vos*, the district court granted summary judgment on an ADA claim where a person experiencing a mental health crisis caused a disturbance in public and the officers ultimately killed him while attempting to arrest him.  *Id*. at 1029–30.  The Ninth Circuit reversed, reasoning

fail for a second reason: they have failed to produce evidence that the officers intentionally discriminated against Young. *See Bircoll*, 480 F.3d at 1083. The Appellants argue that "Appellees had the knowledge to respond in a way consistent with the ADA and RA, and the failure of Appellees to do so was deliberately indifferent to Mr. Young's mental state and ultimately, his life." But the law is clear in this Circuit that "the duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999). We have also held that "'[d]eliberate indifference' . . . is an 'exacting standard,'" which "requires proof that 'the defendant knew that harm to a federally protected right was substantially likely and . . . failed to act on that likelihood.'" *Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1133–34 (11th Cir. 2019) (first quoting *J.S., III ex rel. J.S. Jr. v. Hous. Cnty. Bd. of Educ.*, 877 F.3d 979, 987 (11th Cir. 2017); then quoting *Liese*, 701

---

that the responding officers "had the time and the opportunity to assess the situation and potentially employ the accommodations identified by the Parents, including de-escalation, communication, or specialized help." *Id*. at 1037. But the Ninth Circuit did not address whether Vos was disabled within the meaning of the ADA. In any event, the record in this case does not support a finding of disability—nor does it rise to the level of a genuine dispute—because the Appellants have proffered no evidence in support of claim that Young was disabled. *See Garczynski*, 573 F.3d at 1165.

F.3d at 344). The Appellants have not shown how they meet this standard.

For both these reasons, we find that the district court did not err in granting summary judgment on the Appellants' ADA and RA claims and affirm as to those claims.

### D.    The Motion for Sanctions

Finally, the Appellants claim that the district court abused its discretion in holding that the Appellees did not act in bad faith when they spoliated physical evidence that, in the Appellants' view, was crucial to defeating the Appellees' request for qualified immunity. The evidence in question is Deputy Weller's pants and cell phone case, both of which the Appellees say were damaged by the meat cleaver when Young threw it at the officers.

Our abuse-of-discretion review of a spoliation motion is quite deferential. *See Flury*, 427 F.3d at 943; *Harris*, 97 F.3d at 506. We follow a multi-factor test that includes: (1) "whether the party seeking sanctions was prejudiced as a result of the destruction of evidence and whether any prejudice could be cured"; (2) "the practical importance of the evidence"; (3) "whether the spoliating party acted in bad faith"; and (4) "the potential for abuse if sanctions are not imposed." *ML Healthcare*, 881 F.3d at 1307.

The relevant facts are largely undisputed, although the parties contest the inferences to be drawn from the facts. Shortly after the shooting—either in his patrol car or back at the station—Deputy Weller noticed two holes in his pants, a red mark on his leg, and a gouge in the back of his cell phone case. The cell phone had

been in Deputy Weller's pants pocket, and the red mark was on leg where that pocket sat. Weller told FDLE that the meat cleaver struck him in that spot. FDLE photographed Deputy Weller, the pants, and the cell phone case. Neither FDLE nor ESCO collected the pants or phone case as evidence. Instead, Deputy Weller continued to wear and wash the pants and use the phone case. Despite the Appellants' request (and the Appellees' general obligation) to preserve evidence for litigation, Deputy Weller continued to use these items until 26 or 27 months into the litigation when the Appellants' counsel specifically requested them.

The Appellants filed a motion in limine requesting an adverse inference as a sanction for spoliation. In short, they argued that the pants and phone case were "*the* critical piece of evidence that could support Plaintiffs' position that [the officers] were not justified in using deadly force against Mr. Young." The Appellants claimed they were "severely prejudiced by the inability to conduct forensic analysis of the pants and phone case because such analysis could have conclusively and forensically confirmed that the cuts on the pants and the phone case were not caused by the meat cleaver," thereby undermining the Appellants' justification for use of deadly force.

The magistrate judge issued a report and recommendation recommending that the motion in limine be denied. In reaching that conclusion, the magistrate judge first determined that "the pants, cell phone, and cell phone case indisputably existed at one time (and, Defendants posit, still do)." He also established that "the

duty to preserve arose at the time of the FDLE investigation, irrespective of any claim the photographs were enough." The magistrate judge then turned to the question of how crucial the evidence was, ultimately "acknowledging Plaintiffs' claim that analysis of the items, and comparison of indentations left by the meat cleaver, would be helpful, [but] com[ing] just short of concluding the items (as they existed on December 1, 2018) are crucial to Plaintiffs' case in chief." Finally, the magistrate judge determined that "although the case for carelessness may be strong, Plaintiffs cannot establish [bad faith]."

The Appellants objected, arguing the magistrate judge erred (1) by accepting the Appellees' self-serving assertions that the items preserved in 2021 were the same pants and phone case from the shooting and that they had not been substantially altered; (2) by discounting the expert opinion of Dr. Kris Sperry, who opined that it was impossible to conduct forensic comparisons because of Deputy Weller's intervening use of the items; and (3) by holding the Appellants to an unnecessarily strict burden of proof regarding the import of the evidence. The district court overruled these objections and denied the motion. In that order, the district court adopted the magistrate judge's reasoning and reiterated that the Appellants would have wide latitude at trial to challenge the credibility of the officers, the chain of custody, and the proper inferences to be drawn from the pants and the phone case.

"Spoliation sanctions—and in particular adverse inferences—cannot be imposed for negligently losing or destroying

evidence.  Indeed, 'an adverse inference is drawn from a party's failure to preserve evidence *only* when the absence of that evidence is predicated on bad faith.'"  *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1184 (11th Cir. 2020) (emphasis added) (quoting *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997)); *accord Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1310 (11th Cir. 2009).  The record evidence is sufficient to support a finding that the Appellants acted negligently, but not in bad faith: the FDLE photographed the items immediately after the shooting and included those photographs in written reports; Deputy Weller retained the items for two years; and—after great delay—the Appellees produced the items in discovery.  On these facts, while the Appellees may have acted negligently, the record does not show a purposeful intent to alter or lose the items of evidence in question.  *See Tesoriero*, 965 F.3d at 1184 (explaining that bad faith, "in the context of spoliation, generally means destruction for the purpose of hiding adverse evidence" (quoting *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015))).  Thus, we find no abuse of discretion in the district court's determination that the Appellees' actions concerning the evidence at issue did not rise to the level of bad faith, such that spoliation sanctions were unwarranted.

Nor did the district court abuse its discretion in finding that the evidence was not crucial to the Appellants' case.  First, the Appellants admit that they did not need this evidence to prove their case in chief, but rather to defeat the Appellees' claim of self-defense.  Given this, we cannot say there was significant impairment of the Appellants' ability to prove their case against the Appellees.

*See Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1309 (11th Cir. 2003) ("Plaintiffs' inability to rebut a defense theory is not 'significant impairment' of the Plaintiffs' ability to prove its case. Plaintiffs cannot show that the actual destruction of the test plants in Costa Rica led to their inability to prove their lawsuit. Therefore, the district court properly dismissed Plaintiffs' spoliation claim.").

Second, as we explained, the officers were justified in using deadly force regardless of whether Young ever threw the cleaver. *See Shaw*, 884 F.3d at 1099. In other words, even if the Appellants could conclusively prove that the cleaver did *not* make the marks on Deputy Weller's belongings, that would not move the needle in determining whether the officers reasonably perceived a threat sufficient to justify deadly force. Accordingly, we affirm as to this issue.

## IV.    CONCLUSION

For all these reasons, we affirm the district court's order granting summary judgment in favor of the Appellees.

**AFFIRMED.**